STATE OF CONNECTICUT *v.* ANTHONY JAMES

(15054)

Peters, C. J., and Callahan, Borden, Berdon, Norcott, Katz and Palmer, Js.

Argued October 25, 1995—officially released June 25, 1996

*Elizabeth M. Inkster*, assistant public defender, with whom, on the brief, were *Neal Cone* and *Theresa M. Dalton*, assistant public defenders, for the appellant (defendant).

*Harry Weller*, assistant state's attorney, with whom were *Maureen Keegan*, assistant state's attorney, and, on the brief, *John A. Connelly*, state's attorney, for the appellee (state).

NORCOTT, J. The defendant, Anthony James, was convicted after a jury trial of one count of felony murder in violation of General Statutes § 53a-54c[1] and one count of burglary in the third degree in violation of General Statutes § 53a-103.[2] He received a total effective sentence of fifty years imprisonment.[3] He appealed directly to this court pursuant to General Statutes § 51-199 (b).[4]

On appeal, the defendant claims that: (1) the trial court improperly failed to suppress his written confession; (2) the admission of his written confession at trial violated his right to due process under the state constitution because the police had failed to record the confession electronically; and (3) there was insufficient

---

[1] General Statutes § 53a-54c provides: "Felony murder. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[2] General Statutes § 53a-103 provides in relevant part: "Burglary in the third degree: Class D felony. (a) A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein. . . ."

[3] The defendant was sentenced to fifty years imprisonment on the felony murder conviction and to five years imprisonment, to be served concurrently, on the burglary conviction.

[4] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

evidence to support his conviction. We affirm the judgment of conviction.

The jury reasonably could have found the following facts. On the morning of January 13, 1993, the victim, eighty-one year old Pauline Grincunas, was found with head injuries, lying unconscious on the floor of her apartment in a multiunit house at 13–15 Green Street in Waterbury, by her landlord, Joseph Mariano. The victim was the only tenant occupying the house. A rear exterior door to the house, which led to a first floor apartment, and the front interior door to the victim's second floor apartment had been pried open. Several items in the apartment were out of their usual places,[5] a telephone had been disabled, and the bedroom in which the victim was found had been ransacked.

Waterbury police officers arrived shortly after the victim was discovered. The victim was taken by ambulance to Waterbury Hospital, where she died at 12:30 p.m. from blunt force trauma to the head. An autopsy was performed on January 14, 1993, from which the medical examiner determined that the victim had been struck seven times in the head with an object whose characteristics were consistent with a crowbar.[6] No fingerprints were recovered from the doorways of the house in which the victim had resided or from any items in her apartment. From marks left on the doorways, it was determined that a crowbar had been used to gain entry. No such tool was recovered.

---

[5] Mariano noticed that the night-light that the victim usually kept plugged in or on the kitchen counter had been placed on the kitchen table, that the flashlight she usually kept on the kitchen counter or by her bedside at night was on the kitchen table, that a blanket had been placed over the dining room window, and that the shade on a dining room window had been pulled down. He communicated these observations to the Waterbury police on January 13, 1993.

[6] The medical examiner also found several recent bruises on the victim's hands and body.

Waterbury police canvassed the neighborhood around 13–15 Green Street. The defendant lived nearby at the corner of Green and John Streets. The police spoke with the defendant twice in connection with their investigation of the victim's death, once on January 13, and once on January 14. On both occasions, he gave the police a fictitious name. On January 14, he agreed to go to the police station to discuss the murder and some local burglaries. At the station, he gave the police a second fictitious name, denied his involvement in the crimes, and was driven home.

At approximately 1:30 a.m. on January 15, shortly after the police had received information from an acquaintance of the defendant implicating him in the victim's murder, several police officers went to the defendant's apartment and the apartment of Michael Sebastian, a friend of the defendant, who lived next door to him, to question both of them. Both the defendant and Sebastian were brought to the police station for questioning. After several hours, the defendant signed a confession that stated that during the evening of January 12, 1993, he and Sebastian had broken into the house at 13–15 Green Street, which he had believed to be unoccupied, and that Sebastian had come upon the victim and had struck her with a crowbar. The confession included several accurate details of the crime. The defendant was subsequently arrested and charged with felony murder and burglary.

Prior to trial, the defendant moved to suppress his written confession, claiming that it was the fruit of an illegal seizure at his apartment, and that he had not knowingly, intelligently and voluntarily waived his *Miranda*[7] rights. He also claimed that his confession was not voluntary and that the state must establish

---

[7] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

voluntariness beyond a reasonable doubt in order for his confession to be admissible under the state constitution. After an evidentiary hearing, the trial court denied the motion, finding that the defendant had not been seized by police at his apartment, but had accompanied them to the police station voluntarily. The trial court further found that the state had established, both by a preponderance of the evidence and beyond a reasonable doubt, that the defendant properly had been advised of and validly had waived his *Miranda* rights, and that the confession was voluntary.

At trial, the written confession, redacted in part, was read to the jury. The defendant testified in his own defense. He claimed that he had not been involved in the break-in and murder and that he had never confessed to those crimes, but had signed a completed typewritten confession after several hours of interrogation because the police had threatened to arrest his fiancee and to remove her children, one of whom was his biological child, from their home. The jury found the defendant guilty as charged. Thereafter, the trial court denied the defendant's motions for acquittal[8] and for a new trial,[9] and imposed a total effective sentence of fifty years imprisonment. See footnote 3. This appeal followed. Additional facts will be discussed as they become relevant in the context of the defendant's specific claims.

I

The defendant first claims that the trial court improperly failed to suppress his confession on a number of grounds. Specifically, he claims that the trial court improperly concluded that: (1) he had not been illegally

[8] The defendant moved for a judgment of acquittal on the ground that the evidence adduced at trial was insufficient to support his conviction.

[9] The defendant sought a new trial on the ground that certain remarks made by the prosecutor during closing argument had violated his due process right to a fair trial guaranteed by the fourteenth amendment to the United States constitution and by article first, § 8, of the Connecticut constitution.

seized at his apartment on the morning of January 15, 1993;[10] (2) the state had established that he had knowingly, intelligently and voluntarily waived his *Miranda* rights;[11] and (3) the state had established that his confession was voluntary. The defendant also claims that, under the state constitution, the state was required to prove voluntariness beyond a reasonable doubt in order for the confession to be admissible at trial.[12]

Before turning to the defendant's claims, we first review the evidence presented to the trial court on these

[10] On appeal, the defendant also appears to claim that, even if he was not illegally seized at his apartment, he was nevertheless illegally "detained" thereafter during the course of his interrogation at the police station throughout the morning and, therefore, that his confession should have been excluded as the fruit of that extended encounter. In this regard, he asserts that he was not free to leave the police station at any time after his arrival, and that the police did not have probable cause at any time to detain him. This claim, however, was not raised at trial, and is not accompanied by citation to or discussion of any authority on the issue of custody and, therefore, has not been adequately briefed on appeal. We, therefore, decline to review it.

[11] Although the defendant purports to challenge the trial court's finding that he validly waived his *Miranda* rights, he equates this claim with the claim that the trial court improperly concluded that his confession had been voluntarily given, and does not suggest that he did not understand his rights or the consequences of his waiver. It appears, therefore, that his challenge in this regard is limited to the trial court's finding that the state adequately had established that his waiver of his *Miranda* rights was voluntary. Because the defendant relies on the same evidence of coercion with regard to both the voluntariness of his *Miranda* waiver and the actual voluntariness of his confession, and does not suggest how that evidence could apply differently to his claim regarding the voluntariness of his *Miranda* waiver, this claim is adequately addressed by our analysis of the issue of actual voluntariness.

[12] The defendant also appears to claim that the state should be required to prove beyond a reasonable doubt that he was properly advised of and validly waived his *Miranda* rights. He has not provided an independent analysis of this issue, however, but has equated it with his claim that the state must prove the actual voluntariness of his confession beyond a reasonable doubt. These issues, although related and somewhat overlapping, are nevertheless analytically distinct. Because the defendant has neither clearly raised the claim that a valid *Miranda* waiver must be demonstrated beyond a reasonable doubt, nor addressed his analysis to this issue, we do not reach it.

issues. That evidence was substantially the same at the suppression hearing and at the trial. The police officers who went to the defendant's apartment and subsequently questioned him at the station testified to the following. At 1:30 a.m. on January 15, 1993, Sergeant Neil O'Leary, Sergeant Robert Henderson,[13] Detective Phillip Distasio and Detective William Cassada went to the defendant's apartment. They were not in uniform. Their purpose was to question the defendant concerning the victim's murder and a number of other burglaries, in light of new information they had received about those crimes from Joseph Fields. Fields was an acquaintance of the defendant, who had given a statement to the police implicating the defendant only one-half hour earlier.[14] The officers considered the defendant to be a suspect in the victim's murder at that time.

O'Leary and Henderson proceeded to the front door of the defendant's second floor apartment and Distasio and Cassada were stationed at the back door. According to the officers, this procedure was "routine," undertaken for safety reasons, and to prevent anyone from leaving the apartment without at least being identified. Distasio and Cassada testified that if the defendant had attempted to exit the apartment through the back door, they would have detained him at least long enough for O'Leary to speak to him, but that they had not intended to arrest him.

---

[13] Henderson and another detective, James Egan, had spoken with the defendant the previous afternoon about the murder and several area burglaries, after a resident of the neighborhood had indicated that the defendant and Sebastian might have been involved in the burglaries. The defendant agreed to go to the station for questioning, where he denied involvement in the crimes, and was driven home.

[14] Fields had called the police station during the evening of January 14, with information about the victim's murder and some local burglaries. He was brought to the police station and gave a statement implicating the defendant in those crimes, which statement was completed at approximately 1 a.m. on January 15. Fields' statement was not admitted into evidence at the defendant's trial and Fields did not testify.

O'Leary knocked on the front door, which was answered by Carolyn Fraser, the defendant's fiancee. O'Leary asked Fraser if he could speak to "Tony" and she agreed and invited them into the apartment. Fraser was pleasant, cooperative and did not appear intimidated or frightened. O'Leary also asked Fraser if she would admit the officers at the back door. She agreed and admitted Distasio and Cassada into the kitchen. During this time, the defendant came into the living room from the bedroom. O'Leary identified himself, told the defendant that he was investigating the victim's murder and several burglaries, and asked the defendant if he would come to the station to discuss those crimes. O'Leary did not tell the defendant that he was free to decline. The defendant was calm and cooperative, and agreed to go to the station. He did not object or ask to postpone the interview until the morning. He then went into his bedroom, which did not have a door, to dress; he was not accompanied into the bedroom, but was observed by Henderson, who stood near the doorway. He was not searched. O'Leary, Henderson and the defendant then left the apartment together and drove to the station in a four-door unmarked police car, which did not have a cage. The defendant rode alone in the backseat and, while in the car, did not ask to return home. At no time was he handcuffed or restrained in any way, nor did any of the officers display a weapon. Distasio and Cassada, with Fraser's permission, remained at the apartment to await a possible search warrant.

When the defendant arrived at the police station, he was placed in a small room that ordinarily was used as an office. Sebastian was brought into the station at about the same time and was placed in another room in the same area. Shortly thereafter, before any questioning took place, O'Leary advised the defendant of his *Miranda* rights in the presence of Henderson and

another detective, James Egan. O'Leary read the *Miranda* warnings aloud to the defendant from a rights advisement card.[15] The defendant read the contents of the card aloud, said that he understood his rights, and did not ask to speak to an attorney. O'Leary asked the defendant to sign the rights advisement card. Before signing, the defendant told the detectives that his real name was Anthony James and that he had come to the station with them to clear up his having previously given the police fictitious names.

Throughout the morning, O'Leary, Egan and Henderson, at times individually and at times together, questioned the defendant. They went back and forth between him and Sebastian many times, but did not question the defendant for longer than twenty to thirty minutes at any one time. The defendant was left alone in the room several times, during which the door was left ajar. The room was never locked. The defendant was not told that he was free to leave the station but did not ask to do so. Shortly after he was advised of his *Miranda* rights, the defendant was informed that Sebastian had implicated him in the other burglaries under investigation. The defendant admitted to participating in the burglaries with Sebastian and also told the police that he was "wanted" in Florida under his real name. During the morning, the defendant was provided with food, drink and cigarettes. The police denied that the defendant was physically abused or threatened with Fraser's arrest while at the police station.

At approximately 5:30 a.m., the defendant was informed that Sebastian had told the police that the defendant had admitted to killing the victim. Initially,

---

[15] The card bearing *Miranda* warnings and the defendant's signature was introduced into evidence at the hearing on the defendant's motion to suppress and at trial. The defendant does not claim that the warnings printed on the card failed to comply with *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

the defendant continued to deny his involvement, but, later in the morning, he attempted to negotiate for favorable treatment in the event that he confessed to participating in the break-in and murder before Sebastian confessed. O'Leary told the defendant that he could promise no leniency but urged the defendant to divulge his participation nevertheless.

Between 11 a.m. and noon, the defendant confessed his involvement in the break-in and murder. He was again advised of his *Miranda* rights and agreed to waive those rights and to give a written statement. Between 1:20 p.m. and 3:20 p.m., O'Leary prepared a written statement by typing the defendant's contemporaneous oral statements and answers to O'Leary's questions regarding his personal background, the area burglaries and the break-in at 13–15 Green Street. Egan was present during most of the defendant's statement. When the typewritten statement was completed, the defendant initialed the top of the statement form to acknowledge that he had received, understood and waived his *Miranda* rights, he read the statement aloud and, after making a few changes, which he initialed, signed each page of the statement. Henderson notarized his signature.[16]

---

[16] The statement form first enumerates the *Miranda* warnings and sets forth a statement of waiver, both of which are followed by the defendant's initials. The statement also contains the defendant's age, thirty-one, certain details of his relationship with Fraser, and details of his acquaintance with Sebastian, including the fact that they had committed several local burglaries together, which portion was redacted at trial.

With regard to the break-in and murder, the statement provides as follows. The defendant and Sebastian broke into 13–15 Green Street at approximately 11 p.m. on January 12, 1993, to steal copper. Both men wore gloves. Sebastian pried open a rear door to a first floor apartment while the defendant stood lookout. Finding nothing in that apartment, the two men went upstairs through the front hallway and pried open the door to a second floor apartment. While the defendant searched the kitchen cabinets, he heard a "big thump" and an expletive from Sebastian. He found Sebastian in the bedroom, standing over a person lying on the floor, whose head was near the closet and feet were near the doorway. He and Sebastian then searched the apart-

The defendant and Fraser testified to the following. During the early morning of January 15, 1993, four, not two, police officers "sort of pushed their way in" through the front door of the apartment with their guns drawn, ordered them about the apartment, including ordering the defendant to admit two uniformed officers through the back door, and told the defendant that he was "going for a ride downtown." The defendant claimed that, although he was not told he was under arrest, he had felt from O'Leary's tone that he was not free to refuse. Both Fraser and the defendant further claimed that he was ordered to dress in the living room, that his clothes were searched, that he was escorted to his baby's crib, into which one officer pointed his gun, and that he was handcuffed.[17] The defendant claimed that he had felt that he was being arrested for the victim's murder, and that he would not be permitted to get out of the police car. Fraser also claimed that she had felt that the defendant was being arrested for the murder.

With regard to his experience at the police station, the defendant testified to the following. He claimed that when he arrived, Egan struck him on the face and chest,[18] did not advise him of his *Miranda* rights, and

ment, and he pulled down a shade in the living room, pulled a phone cord from the wall, and unplugged the night-light in the kitchen and put it on the table. Both men then left the house. The defendant went briefly to his own apartment, where he saw Fraser, and then next door to the apartment Sebastian shared with Danielle Konopelski. Sebastian was already in the shower, and the defendant returned home.

The statement also provides: "I went voluntarily to the police station. I am sorry for everything that happened." The defendant's initials appear in the body of the statement where corrections appear to have been made and his signature appears at the bottom of each page.

[17] According to the defendant, he was handcuffed by Henderson just before the defendant left the porch to walk down the stairs with Henderson and O'Leary. Fraser, however, testified that she thought the defendant had been handcuffed at the police car.

[18] The defendant made this claim only during the suppression hearing. He did not testify at trial that Egan or any other officer struck him while he was at the police station that morning.

that, when he asked for an attorney, Egan told him it was too late at night to have a public defender come to the station. The defendant further testified that he had been advised of his *Miranda* rights 200 to 300 times prior to this incident.

According to the defendant, during the course of the morning he was interrogated by four or five police officers, was moved into a number of different rooms, was not given food, and was denied access to a bathroom, forcing him to urinate into a trash can.[19] He claimed that he had consistently denied any involvement in the murder or in the area burglaries, but conceded that he had admitted to having broken into a plumbing store next door to 13–15 Green Street with Sebastian. He also claimed that at around 6:30 a.m., an unidentified officer had shown him a written statement by Sebastian that said that the defendant had admitted to Sebastian that he had broken into 13–15 Green Street and killed the victim, and also showed him pictures of the crime scene.[20] Subsequently, he claimed, he attempted to sleep, but was told to get up by a different unidentified officer.

Finally, the defendant testified that between 9 a.m. and 10 a.m., he had told O'Leary that he was wanted in Florida, and had given him his real name and social security number. The defendant claimed that O'Leary returned shortly thereafter and told him that although the charges in Florida were not serious in nature, O'Leary would arrest Fraser on charges of harboring a

---

[19] The defendant did not testify to this incident at trial.

[20] At trial, Detective Martin Mancinelli testified that he and Detective Ken Henebry, a forensic photographer, had responded to 13–15 Green Street on January 13, 1993, to collect evidence from the crime scene. Henebry had taken photographs of the crime scene on that date. Mancinelli testified that, ordinarily, either he or Henebry would develop such photographs, and that the photographs taken at 13–15 Green Street on January 13, had not been developed on January 13, 14 or 15.

fugitive if the defendant did not cooperate, and, a short time later, that O'Leary and Egan had shown him what they claimed was an arrest warrant for Fraser, and repeated the threat to arrest her and to place her children in state custody. He claimed that he had agreed to sign a confession at that point to protect Fraser, and that he was presented with an already completed, typewritten confession, which he initialed and signed after having read aloud only a small portion of it. He also claimed that he had signed the *Miranda* rights advisement card, which he had not seen before, at the same time, and that he had not sworn to the truth of the statement.

## A

We first address the defendant's claim that the trial court improperly concluded that he had not been illegally seized, under article first, § 7, of the state constitution[21] or the fourth amendment to the federal constitution,[22] when several Waterbury police officers entered his home during the early morning hours of January 15, 1993, and escorted him to the police station. We disagree.

[21] The constitution of Connecticut, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[22] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

"The United States Supreme Court has held that the fourth amendment's prohibition against the use of evidence obtained as the result of an illegal search is applicable to the states through the fourteenth amendment to the United States constitution. See *Mapp* v. *Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, reh. denied, 368 U.S. 871, 82 S. Ct. 23, 7 L. Ed. 2d 72 (1961)." *State* v. *Rasmussen*, 225 Conn. 55, 80 n.17, 621 A.2d 728 (1993).

It is well settled that "[i]f the police obtain physical evidence or statements as the result of the seizure of a person without probable cause, in violation of the constitution of Connecticut, article first, §§ 7 and 9, [or the fourth amendment to the United States constitution] the 'fruit of the poisonous tree' doctrine requires that the evidence be suppressed as the product of the unlawful seizure." *State* v. *Greenfield,* 228 Conn. 62, 67, 634 A.2d 879 (1993); see *Brown* v. *Illinois,* 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975); *Wong Sun* v. *United States,* 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). "Therefore, a two-part analysis is required: was the defendant seized; and, if so, was there probable cause for the seizure."[23] *State* v. *Greenfield,* supra, 67. "We have . . . defined a person as seized under our state constitution when by means of physical force or a show of authority, his freedom of movement is restrained." (Internal quotation marks omitted.) *State* v. *Oquendo,* 223 Conn. 635, 647, 613 A.2d 1300 (1992). "In determining the threshold question of whether there has been a seizure, we examine the effect of the police conduct at the time of the alleged seizure, applying an objective standard. Under our state constitution, a person is seized only if in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *State* v. *Oquendo,* supra, 647; see *United States* v. *Mendenhall,* 446 U.S. 544, 553–54, 100 S. Ct. 1870, 64 L. Ed. 2d 497, reh. denied, 448 U.S. 908, 100 S. Ct. 3051, 65 L. Ed. 2d 1138 (1980)." (Internal quotation marks omitted.) *State* v. *Greenfield,* supra, 68; see also *State* v. *Rasmussen,* 225 Conn. 55, 80–81, 621 A.2d 728 (1993); *State* v. *Damon,* 214 Conn. 146, 152, 570 A.2d 700, cert. denied, 498 U.S. 819, 111 S. Ct. 65, 112 L. Ed. 2d 40 (1990). Under the federal

---

[23] The state concedes that the police lacked probable cause to arrest the defendant at his apartment and does not argue that, if a seizure occurred, a lesser degree of suspicion would justify it.

constitution, in contrast, a seizure occurs only if there is a show of "physical force . . . or . . . submission to the assertion of authority." *California* v. *Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991).

"A person is not arrested or seized [however] . . . if he freely chooses to enter into or continue an encounter with the police. *United States* v. *Brunson*, 549 F.2d 348, 357 (5th Cir. 1977), cert. denied, 434 U.S. 842, 98 S. Ct. 140, 54 L. Ed. 2d 107 (1977). Police officers do not violate an individual's constitutional rights by approaching him, by asking him if he is willing to answer some questions, by putting questions to him if he is willing to listen, or by offering into evidence in a criminal prosecution his voluntary answers to such questions. *Florida* v. *Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *State* v. *Brown*, 199 Conn. 47, 52–53, 505 A.2d 1225 (1986)." *State* v. *Damon*, supra, 214 Conn. 153–54. Among the factors that may be considered in determining whether a defendant's encounter with police was consensual in nature are: " 'the time, place and purpose of the encounter; the words used by the officer; his tone of voice and general demeanor in requesting the defendant to accompany him to the police station; the officer's statements to others who were present during the encounter; the manner in which the defendant was escorted out of the house and transported to the stationhouse; the officer's response to any questions by the defendant . . . regarding the defendant's right to refuse to go to the stationhouse; and the defendant's verbal or non-verbal responses to any directions given to him by the officer.' " 3 W. LaFave, Search and Seizure (3d Ed. 1996) § 5.1 (a), p. 5, quoting *People* v. *Pancoast*, 659 P.2d 1348, 1351 (Colo. 1982).

The trial court's findings of historical fact regarding the defendant's encounter with police at his apartment

will not be overturned unless they are clearly erroneous. On the ultimate question of whether a seizure occurred, however, we conduct a scrupulous, independent review of the record to ensure that the trial court's determination was supported by substantial evidence. See *State v. Greenfield*, supra, 228 Conn. 68–69; cf. *State v. Atkinson*, 235 Conn. 748, 759 and n.17, 679 A.2d 920 (1996) (review of custody determination under state law comports with that of United States Supreme Court in *Thompson v. Keohane*, 516 U.S. 99, 112–16, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995), which held that findings of historical fact with regard to custody are subject to clearly erroneous review and that ultimate determination of custody is mixed question of law and fact requiring independent review by appellate court).

The trial court, in an oral decision, found that the officers went to the defendant's apartment on the basis of information received from Fields, that they were "admitted to the defendant's apartment, and when [the defendant] was told that the police wanted him to come to headquarters for questioning concerning burglaries and the homicide of an elderly woman, the defendant got dressed and freely consented to accompany the officers. The day before, the defendant was also stopped by Waterbury police officers and agreed to go with them to the police station for questioning. After that interrogation, police officers drove him home." The trial court "conclude[d] that during the early morning hours of January 15, 1993, the defendant went voluntarily in the company of the police to police headquarters. [It did] not conclude under applicable federal or state standards that the defendant was seized at his home or that the defendant's incriminatory statements were the fruit of an illegal arrest, as discussed in *State v. Oquendo*, [supra, 223 Conn. 635]."

The defendant argues that the trial court's factual findings should be overturned because they rest implic-

itly on the police version of the encounter at his apartment and the police version of that encounter was not credible. The defendant further argues that, even if the circumstances are found to be those described by the police, the trial court improperly concluded that he was not seized, but rather voluntarily left his home and went to the police station. We are not persuaded.

The trial court, in the hearing on the defendant's motion to suppress his written confession, was presented with two versions of the encounter between the police and the defendant at his apartment that conflicted in several material respects. The court's findings turned primarily on which witnesses it believed. " 'In a [proceeding] tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony.' " *Steiger* v. *J. S. Builders, Inc.*, 39 Conn. App. 32, 34–35, 663 A.2d 432 (1995). "Where there is conflicting evidence . . . we do not retry the facts or pass on the credibility of the witnesses. . . . The probative force of conflicting evidence is for the trier to determine." (Citation omitted; internal quotation marks omitted.) Id., 34. The trial court reasonably accepted the police officers' version of events at the defendant's apartment, and expressly rejected the conflicting testimony of the defendant and Fraser as not credible. We will not retry these credibility determinations on appeal.

We are also unpersuaded by the defendant's claim that, even accepting the police version of events, the trial court must necessarily have concluded that the defendant did not voluntarily go to the police station, but was seized. It is undisputed that whether the defendant was seized turns on the application of an objective standard, namely, whether a reasonable person in the defendant's circumstances would have believed that he was not free to refuse to accompany the police officers to the station for questioning. In support of his claim,

the defendant relies on the timing of the encounter, the presence of several officers, and the evidence of the intent of Distasio and Cassada to detain him if he had attempted to exit the apartment through the back door.

The determination of whether a seizure occurred must be made in light of the totality of the circumstances. See *State* v. *Chung*, 202 Conn. 39, 53, 519 A.2d 1175 (1987). Thus, although we agree with the defendant that the lateness of the hour at which the encounter occurred and the presence of several officers clearly imparted a sense of urgency and importance to O'Leary's request that the defendant accompany him to the station to answer questions, we do not consider these elements of the encounter dispositive.[24] Several other factors counteracted the pressure inherent in those circumstances. According to the police, they knocked at the door to the apartment and asked to speak to the defendant. They did not, as the defendant claimed, use force or display their weapons, and they were not in uniform. Additionally, although the defendant was not told that he could refuse to go to the station, there is no evidence that he was made aware that Fields had recently implicated him in the crimes, and he did not object or request to go to the police station at another time. Furthermore, according to the police, he was permitted to go into his bedroom unescorted and was not searched, handcuffed or restrained in any way. Additionally, as the trial court noted, he had considerable experience with police procedure generally and was familiar with at least one of the detectives admitted through the front door, having voluntarily accompanied him to the police station for questioning several hours earlier, after which he had been driven home. Although the defendant seems to suggest that no reasonable per-

---

[24] The defendant does not claim that the police purposely delayed their visit until 1:30 a.m. Rather, he concedes that they acted on Fields' statement shortly after it was completed.

son would voluntarily agree to leave his home at such a late hour to go to the police station for questioning, we agree with the state that a reasonable person in the defendant's circumstances might have considered it prudent to cooperate by going to the station, even at that late hour, expecting that when he again denied his involvement, he would return home.

With regard to the intent of the detectives at the back door to detain the defendant in some fashion if he had attempted to exit through that door, we agree with the state that there is no evidence that this intent was expressed to the defendant, and it was, therefore, a circumstance of which he was not aware. As such, it does little to advance his claim that the circumstances were such that a reasonable person would not have felt free to decline to go to the station. See *Stansbury* v. *California*, 511 U.S. 318, 325, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994); *United States* v. *Mendenhall*, supra, 446 U.S. 554 n.6; 3 W. LaFave, supra, § 5.1 (a), p. 8. In sum, we are not persuaded that the trial court was required to conclude that a reasonable person in the defendant's circumstances would not have felt free to refuse to accompany the police to the station for questioning.

We conclude, therefore, on the basis of our review of the record, that substantial evidence supported the trial court's determination that the defendant was not seized by the police at his apartment under either the fourth amendment to the federal constitution or article first, § 7, of the state constitution, but, rather, that he voluntarily agreed to accompany the police to the police station for further questioning regarding the murder and some local burglaries.

B

The defendant next claims that the trial court improperly concluded that his written confession was volun-

tary. Specifically, he claims that the due process clause of article first, § 8, of the state constitution[25] requires the state to prove beyond a reasonable doubt that a confession is voluntary in order for the confession to be admissible at trial, and that the trial court's finding that the state had met this burden was improper. Alternatively, he claims that the trial court's determination that the state had established voluntariness by a preponderance of the evidence was also improper. We disagree with the defendant's contentions.

It is well established that "[t]he use of an involuntary confession in a criminal trial is a denial of due process of law. *Mincey* v. *Arizona,* 437 U.S. 385, 398, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978); *Jackson* v. *Denno,* 378 U.S. 368, 376, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964); *Culombe* v. *Connecticut,* 367 U.S. 568, 602, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961); *State* v. *Shifflett,* 199 Conn. 718, 727, 508 A.2d 748 (1986)." *State* v. *Schroff,* 206 Conn. 182, 195, 536 A.2d 952 (1988). Furthermore, a criminal defendant is entitled, as a matter of due process, to a reliable, clear-cut determination prior to trial that the confession sought to be introduced by the state was made voluntarily. *Jackson* v. *Denno,* supra, 391. In Connecticut, the preliminary voluntariness determination is made by the trial court. See *State* v. *Oliver,* 160 Conn. 85, 95, 273 A.2d 867 (1970), cert. denied, 402 U.S. 946, 91 S. Ct. 1637, 29 L. Ed. 2d 115 (1971).

"In order to be voluntary a confession must be the product of an essentially free and unconstrained choice by the maker. . . . If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of the confession offends due

---

[25] The constitution of Connecticut, article first, § 8, provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

process." (Citations omitted; internal quotation marks omitted.) *State* v. *Chung*, supra, 202 Conn. 53. "The determination of whether a confession is voluntary must be based on a consideration of the totality of circumstances surrounding it"; id., 53–54; including both "the characteristics of the accused and the details of the interrogation." (Internal quotation marks omitted.) *State* v. *Madera*, 210 Conn. 22, 41, 554 A.2d 263 (1989). Factors that may be taken into account, "upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep." (Internal quotation marks omitted.) Id.; see also *State* v. *Shifflett*, supra, 199 Conn. 728. Under the federal constitution, however, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' . . . ." *Colorado* v. *Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986).

The trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are "findings of fact . . . which will not be overturned unless they are clearly erroneous." (Citation omitted.) *State* v. *Atkinson*, supra, 235 Conn. 759. On the ultimate issue of voluntariness, however, we will conduct "an independent and scrupulous examination of the entire record to ascertain whether the trial court's finding is supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Chung*, supra, 202 Conn. 54; see *Miller* v. *Fenton*, 474 U.S. 104, 112, 106 S. Ct. 445, 88 L. Ed. 2d 405 (1985) (although trial court's findings on subsidiary facts entitled to presumption of correctness under 28 U.S.C. § 2254 [d], ultimate determination of voluntariness is subject to independent review); *Mincey* v. *Arizona*, supra, 437 U.S. 398 (trial

court's voluntariness determination subject to independent review); cf. *State* v. *Whitaker*, 215 Conn. 739, 753, 578 A.2d 1031 (1990) (in determining whether defendant voluntarily waived *Miranda* rights, court "defer[s] to trial court's findings on subsidiary factual questions, as compared with the ultimate legal finding of voluntariness").

We turn first to the defendant's contention that the prosecution must, under the state constitution, prove the voluntariness of a confession beyond a reasonable doubt. This claim was raised in the trial court, which court, without reaching the merits of this claim, determined that the state had satisfied both the preponderance standard and the reasonable doubt standard. On appeal, the defendant concedes that his claim has previously been rejected in favor of the preponderance standard, both under the federal constitution; see *Lego* v. *Twomey*, 404 U.S. 477, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); and under the state constitution. *State* v. *Staples*, 175 Conn. 398, 399 A.2d 1269 (1978).

In *Staples*, the defendant claimed that voluntariness must be shown beyond a reasonable doubt "under Connecticut jurisprudence"; id., 403; because the involuntariness of a confession implicates its reliability and, therefore, the requirement of proof of guilt beyond a reasonable doubt would be violated "unless it is required that voluntariness be proven by the same standard of proof." Id., 404. We relied on the Supreme Court's response to essentially the same claim in *Lego*, reasoning that "implicit in [that claim] was an unjustified assumption that a voluntariness hearing was designed to enhance the reliability of jury verdicts or to implement the presumption of innocence"; id., 405; and concluding that " '[a] guilty verdict is not rendered less reliable or less consonant with [the requirement of proof beyond a reasonable doubt] simply because the admissibility of a confession is determined by a

less stringent standard.' " Id., quoting *Lego* v. *Twomey*, supra, 404 U.S. 487. We also rejected the contention that we considered to be implicit in the defendant's claim, namely, that "the values served by the exclusionary rules, including the deterring of improper police conduct, independently demand that the reasonable doubt standard be required in the admissibility of confessions." *State* v. *Staples*, supra, 175 Conn. 405. Noting the Supreme Court's observations in *Lego* v. *Twomey*, supra, 488, that there was not substantial evidence that voluntariness determinations governed by the preponderance standard were unreliable or would result in derogation of a criminal defendant's constitutional rights, we concluded that "[w]e have been given no valid reason why proof by [the preponderance] standard, with a judge making a positive finding on voluntariness, does not provide a fair and workable test which affords a criminal defendant those rights guaranteed him by both the United States and Connecticut constitution." *State* v. *Staples*, supra, 406.

The defendant asks us to overrule *Staples*. We have held that "a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." (Internal quotation marks omitted.) *White* v. *Burns*, 213 Conn. 307, 335, 567 A.2d 1195 (1990). In support of his claim, the defendant relies on three elements of constitutional analysis set forth in *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992), and *State* v. *Linares*, 232 Conn. 345, 379, 655 A.2d 737 (1995),[26] which include historical background,

---

[26] In interpreting our state constitution, "we consider the following 'tools of analysis': (1) the 'textual' approach—consideration of the specific words in the constitution; (2) holdings and dicta of this court and the Appellate Court; (3) federal precedent; (4) the 'sibling' approach—examination of other states' decisions; (5) the 'historical' approach—including consideration of the historical constitutional setting and the debates of the framers; and (6) economic and sociological, or public policy, considerations." *State* v. *Linares*, supra, 232 Conn. 379. The defendant concedes that pertinent federal and state precedent do not support his claim.

sister state decisions and public policy concerns. We are not persuaded that these tools of analysis, either independently or in concert, justify the conclusion that *Staples*, in adopting the preponderance standard of proof pursuant to the state constitution, was wrongly decided.

The defendant first argues that the common-law approach to the admissibility of confession evidence, as reflected in certain case law and in commentary by Chief Justice Zephaniah Swift and William Blackstone, demonstrates a historical commitment to requiring the state to meet the highest standard of proof on the voluntariness issue. We disagree.

"As we have noted on other occasions, our common law history is an important source of enlightenment about the meaning to be ascribed to open-ended constitutional provisions guaranteeing due process." *State* v. *Joyner*, 225 Conn. 450, 467, 625 A.2d 791 (1993). The authorities relied upon by the defendant reflect the common-law evidentiary rule that a confession may be kept from the jury if the circumstances under which it was given render it unreliable evidence of guilt. See *State* v. *Willis*, 71 Conn. 293, 310, 41 A. 820 (1898) (in describing development of evidentiary rules regarding confessions, "[t]he question is, shall this evidence, admissible as relevant, be excluded, because in the opinion of the judge the conditions of the declaration come within those conditions that make such an admission too unreliable to go to the jury"); 1 W. LaFave & J. Israel, Criminal Procedure (1984) § 6.2, pp. 439–40; 3 J. Wigmore, Evidence (Chadbourn Rev. 1970) § 822, p. 329 n.1. The purpose of the rule, which arose during the middle of the eighteenth century, prior to which time extrajudicial confessions were freely admitted; 1 W. LaFave & J. Israel, supra, § 6.2, p. 439; 3 J. Wigmore, supra, § 819, pp. 296–97; was to "protect a defendant from an erroneous conviction based upon a false con-

fession." 1 W. LaFave & J. Israel, supra, § 6.2, p. 440; cf. *State* v. *Willis*, supra, 312 (" '[t]he true point of consideration, therefore, is whether the prisoner has falsely declared himself guilty of a capital offence' "). "Generally, the approach under the common law rule was to identify certain inducements which made a confession unreliable." 1 W. LaFave & J. Israel, supra, § 6.2, p. 440. As frequently stated, the rule required a confession to be excluded from evidence, as involuntary, if it was obtained as a result of a promise of a benefit or leniency or a threat of harm. See id.; 3 J. Wigmore, supra, § 822, p. 397 n.1. This principle was clearly part of the common law of evidence in this state.[27]

In *Rogers* v. *Richmond*, 365 U.S. 534, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961), however, the Supreme Court rejected the common law focus on reliability in determining whether a confession is admissible. The court concluded that, under the federal constitution, in determining whether a confession should be excluded as involuntary, the test is "whether the defendant's will was overborne, which is to be determined with complete disregard of whether or not the [accused] in fact spoke the truth." Id., 544. This is so, the court reasoned, because involuntary confessions are excluded "not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." Id., 540–41. The court concluded,

---

[27] See *State* v. *Lorain*, 141 Conn. 694, 700, 109 A.2d 504 (1954); *State* v. *Palko*, 121 Conn. 669, 680–81, 186 A. 657 (1936); *State* v. *Willis*, supra, 71 Conn. 312; *State* v. *Coffee*, 56 Conn. 399, 414–15, 16 A. 151 (1888); *State* v. *Potter*, 18 Conn. 165, 178 (1846); Z. Swift, A Digest of the Laws of Evidence (1810) p. 133.

therefore, that the use by the trial court and by this court of a standard "infected by the inclusion of references to probable reliability [had] resulted in a constitutionally invalid conviction . . . ." Id., 544.[28]

It is clear, then, that the common law exclusionary rule employed a different notion of voluntariness and relied upon a different rationale for excluding confession evidence than its constitutional counterpart. The former was an evidentiary rule aimed at safeguarding the trustworthiness of evidence at trial, while the latter is aimed at protecting a criminal defendant's right to be free from compulsion to incriminate himself or herself. Our common law on this issue, is, therefore, of limited usefulness in defining the contours of the constitutional exclusionary rule, for the common law authorities upon which the defendant relies simply did not address themselves to the question of what rule or standards of proof would be appropriate or necessary to effectuate the goal of protecting a criminal defendant's right to be free from coercion, without regard to the probativeness of the confession produced. With that in mind, we turn to the defendant's specific arguments.

First, the defendant argues that certain commentary by Swift and Blackstone[29] suggesting a strict rule on

---

[28] The United States Supreme Court noted that Connecticut courts also appeared at times to have applied the common law rule categorically, requiring exclusion if an improper inducement existed, without regard to the likely reliability of the particular confession at issue. See *Rogers* v. *Richmond*, supra, 365 U.S. 543 n.1.

[29] See 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823) p. 408 ("[C]onfessions are from their nature liable to suspicions . . . so likely to be influenced by hope, or fear, and so liable, like all hearsay evidence to be misrepresented, and changed in the narration, that the law does not suffer them to be received except under peculiar circumstances. . . . [T]he confession must be perfectly voluntary: for if the least degree of influence appear to be exercised over the prisoner's mind, to induce him to disclose his guilt, the whole will be rejected."); 4 W. Blackstone, Commentaries on the Laws of England (1807) p. 357 ("indeed, even in cases of felony at the common law, [confessions] are the weakest and most suspicious of all

voluntariness also suggests that, at common law, the state was required to demonstrate the admissibility of a confession beyond a reasonable doubt. We disagree. These authorities do not address directly the standard of proof on this issue. Furthermore, their advocacy of a stringent rule of exclusion appears to reflect a temporary expansion of the common-law rule during the early nineteenth century that was later rejected. According to Wigmore, the common-law exclusionary rule was initially quite narrow in scope, but underwent significant expansion by English judges, who, largely out of concern arising from the common-law rule prohibiting criminal defendants from testifying in their defense came to espouse mistrust of confessions and to apply the common-law evidentiary rule to require exclusion upon the finding of any conduct that qualified as an inducement, however slight. 3 J. Wigmore, supra, §§ 820 and 820a, pp. 297–301; see also *State* v. *Willis*, supra, 71 Conn. 311 (noting unduly formalistic application of rule of exclusion). Wigmore suggested, however, that this formal, exacting approach to confession evidence constituted a distortion of the rule that was not justified by its true rationale—to keep false confessions from the jury—and that, once criminal defendants were permitted to testify in their own trials, it was proper in most cases to submit a confession to the jury. See 3 J. Wigmore, supra, §§ 820a and 820b, pp. 300–306. This court in *State* v. *Willis*, supra, 310–11, also suggested that the formalistic approach that derived from English case law applying the common-law rule, upon which Swift relied, was unwarranted, and indicated instead that a more moderate, or "common sense" view should prevail. The defendant points to no case applying the

testimony; ever liable to be obtained by artifice, false hopes, promises of favor, or menaces; seldom remembered accurately, or reported with due precision; and incapable in their nature of being disproved by other negative evidence").

common-law rule that adopts the severe approach to exclusion advanced by these commentators.

The defendant also relies on later case law applying the common-law rule, which, we agree, clearly allocated the burden of persuasion on admissibility to the state. *State* v. *Lorain*, 141 Conn. 694, 700, 109 A.2d 504 (1954); *State* v. *Castelli*, 92 Conn. 58, 67, 101 A. 476 (1917). These cases do not, however, address the standard of proof on the admissibility issue. The admissibility of a confession was deemed a preliminary question of fact for the discretion of the trial court, subject on review to a standard of abuse of discretion. *State* v. *Willis*, supra, 71 Conn. 313; *State* v. *Castelli*, supra, 65; *State* v. *Potter*, 18 Conn. 165, 178 (1846) (suggesting wide latitude). Both the United States Supreme Court, in *Lego* v. *Twomey*, supra, 404 U.S. 477, and this court in *State* v. *Staples*, supra, 175 Conn. 398, appear to have assumed that courts were employing the preponderance standard of proof in determining admissibility, and did not indicate that by adopting the preponderance standard as a constitutional matter, the law or practice in this regard would be changed. Their assumption is consistent with both the "orthodox" view that preliminary questions of fact generally are to be made using the preponderance standard of proof; 1 J. Wigmore, supra, § 17, p. 771 n.20; J. Maguire & C. Epstein, "Preliminary Questions of Fact in Determining the Admissibility of Evidence," 40 Harv. L. Rev. 392, 422–23 (1927); cf. *State* v. *Figueroa*, 235 Conn. 145, 179, 665 A.2d 63 (1995) (whether warrant was issued within period of limitations is preliminary question of fact on which state bears burden of proof by preponderance of evidence); and with the general rule, particularly in civil cases, that "we assume that a trial court has applied the fair preponderance of the evidence standard when it has failed to indicate the standard applied." *State* v. *Davis*, 229 Conn. 285, 302, 641 A.2d 370 (1994). In light of this

background, we do not read the common-law rule as applied in this state to have held the prosecution to "an especially severe standard of proof"; *Lego* v. *Twomey,* supra, 478; and, consequently, we agree with the state that it does not support the defendant's claim.

The defendant next points to the decisions of several sister state courts adopting the reasonable doubt standard of proof on the voluntariness issue under state law.[30] These states, however, constitute the minority. The substantial majority[31] of states to have considered this issue have followed *Lego* v. *Twomey,* supra, 404

---

[30] See *Taylor* v. *State,* 479 N.E.2d 1310 (Ind. 1985); *Bradley* v. *Commonwealth,* 439 S.W.2d 61 (Ky. 1969), cert. denied, 397 U.S. 974, 90 S. Ct. 1091, 25 L. Ed. 2d 268 (1970); *State* v. *Vernon,* 385 So. 2d 200 (La. 1980); *State* v. *Collins,* 297 A.2d 620 (Me. 1972); *Commonwealth* v. *Tavares,* 385 Mass. 140, 430 N.E.2d 1198, cert. denied, 457 U.S. 1137, 102 S. Ct. 2967, 73 L. Ed. 2d 1356 (1982); *Harrison* v. *State,* 285 So. 2d 889 (Miss. 1973); *State* v. *Phinney,* 117 N.H. 145, 370 A.2d 1153 (1977); *State* v. *Franklin,* 52 N.J. 386, 245 A.2d 356 (1968); *People* v. *Huntley,* 15 N.Y.2d 72, 204 N.E.2d 179, 255 N.Y.S.2d 838 (1965); *State* v. *Drayton,* 287 S.C. 226, 337 S.E.2d 216 (1985); *State* v. *Hintz,* 318 N.W.2d 915 (S.D. 1982); *State* v. *Owens,* 148 Wis. 2d 922, 436 N.W.2d 869 (1989).

[31] See *Magwood* v. *State,* 494 So. 2d 124 (Ala. Crim. App. 1985), aff'd, 494 So. 2d 154, cert. denied, 479 U.S. 995, 107 S. Ct. 599, 93 L. Ed. 2d 599 (1986); *Stobaugh* v. *State,* 614 P.2d 767 (Alaska 1980); *State* v. *Burr,* 126 Ariz. 338, 615 P.2d 635 (1980); *Jackson* v. *State,* 273 Ark. 107, 617 S.W.2d 13 (1981); *People* v. *Fordyce,* 200 Colo. 153, 612 P.2d 1131 (1980); *State* v. *Rooks,* 401 A.2d 943 (Del. 1979); *Wells* v. *United States,* 407 A.2d 1081 (D.C. 1979); *McDole* v. *State,* 283 So.2d 553 (Fla. 1973); *White* v. *State,* 242 Ga. 21, 247 S.E.2d 759 (1978); *State* v. *Aitken,* 121 Idaho 783, 828 P.2d 346 (1992); *People* v. *King,* 109 Ill. 2d 514, 488 N.E.2d 949 (1986); *State* v. *Rank,* 214 N.W.2d 136 (Iowa 1974); *Hillard* v. *State,* 286 Md. 145, 406 A.2d 415 (1979) (admissibility by preponderance, but once admitted, trier of fact must find voluntary beyond reasonable doubt); *People* v. *DeLisle,* 455 N.W.2d 401 (Mich. App. 1990); *State* v. *Pilcher,* 472 N.W.2d 327 (Minn. 1991); *State* v. *Hahn,* 618 S.W.2d 435 (Mo. 1981); *State* v. *LaFreniere,* 163 Mont. 21, 515 P.2d 76 (1973); *State* v. *Porter,* 235 Neb. 476, 455 N.W.2d 787 (1990); *Quiriconi* v. *State,* 96 Nev. 766, 616 P.2d 1111 (1980); *State* v. *Jones,* 327 N.C. 439, 396 S.E.2d 309 (1990); *State* v. *Arrington,* 14 Ohio App. 3d 111, 470 N.E.2d 211 (1984); *Commonwealth ex rel. Butler* v. *Rundle,* 429 Pa. 141, 239 A.2d 426 (1968); *State* v. *Breznick,* 134 Vt. 261, 356 A.2d 540 (1976); *Griggs* v. *Commonwealth,* 220 Va. 46, 255 S.E.2d 475 (1979); *State* v. *Vance,* 162 W. Va. 467, 250 S.E.2d 146 (1978); *Garcia* v. *State,* 777 P.2d 603 (Wyo. 1989).

U.S. 477, and have adopted the preponderance standard under state law.[32] Furthermore, of those states adopting the higher standard, a number have failed to make clear whether their decisions are constitutionally based; see *Bradley* v. *Commonwealth*, 439 S.W.2d 61, 64 (Ky. 1969), cert. denied, 397 U.S. 974, 90 S. Ct. 1091, 25 L. Ed. 2d 268 (1970); *State* v. *Phinney*, 117 N.H. 145, 146, 370 A.2d 1153 (1977); *State* v. *Owens*, 148 Wis. 2d 922, 929–30, 436 N.W.2d 869 (1989); or have done so expressly on nonconstitutional grounds. See *People* v. *Jiminez*, 21 Cal. 3d 595, 605, 580 P.2d 672, 147 Cal. Rptr. 172 (1978) (adopting reasonable doubt standard of proof as "judicially declared rule of criminal procedure"), rev'd, *People* v. *Markham*, 49 Cal. 3d 63, 65, 775 P.2d 1042, 260 Cal. Rptr. 273 (1989) (pursuant to amendment to state constitution, California law on standard of proof for voluntariness determination is same as federal constitutional law); *Commonwealth* v. *Tavares*, 385 Mass. 140, 152, 430 N.E.2d 1198, cert. denied, 457 U.S. 1137, 102 S. Ct. 2697, 73 L. Ed. 2d 1356 (1982) (reasonable doubt standard imposed as matter of state's "humane practice" rule). Also, a number of states appear to have adopted the reasonable doubt standard in anticipation of the adoption of such a standard by the Supreme Court under the federal constitution. See *Burton* v. *State*, 260 Ind. 94, 105, 292 N.E.2d 790 (1973); *Harrison* v. *State*, 285 So. 2d 889, 890 (Miss. 1973); *State* v. *Yough*, 49 N.J. 587, 589–601, 231 A.2d 598 (1967).

Finally, the defendant advances two policy reasons, both relied upon by some sister state courts, in support of his claim that this court should adopt the reasonable doubt standard pursuant to our state constitution. He argues that the reasonable doubt standard is necessary both to protect adequately a criminal defendant's right

---

[32] Only one state, Rhode Island, has chosen the clear and convincing standard of proof. The origins of this standard are not clear. See *State* v. *Arpin*, 410 A.2d 1340 (R.I. 1980).

not to be compelled to incriminate himself or herself, and to protect a criminal defendant from an inaccurate jury verdict based on confession evidence. "Our analysis of the constitutional requirements of due process in this regard is informed by the understanding that, under the state constitution, as under the federal constitution, 'due process is flexible and calls for such procedural protections as the particular situation demands.' *Morrissey* v. *Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972); see *State* v. *Lamme*, [216 Conn. 172, 178, 579 A.2d 484 (1990)]; see also *Tedesco* v. *Stamford*, 222 Conn. 233, 242, 610 A.2d 574 (1992); *Asherman* v. *Meachum*, 213 Conn. 38, 46, 49–53, 566 A.2d 663 (1989)." *State* v. *Joyner*, supra, 225 Conn. 470–71. We are not persuaded that the preponderance standard fails to satisfy due process under the state constitution.

The voluntariness determination serves, primarily, to protect a criminal defendant's right to be free from compulsion to incriminate himself, which, we agree with the defendant and our sister states, enjoys express constitutional status, is considered fundamental to our system of criminal justice and is, therefore, weighty. See *Rogers* v. *Richmond*, supra, 356 U.S. 543–44; *State* v. *Jiminez*, supra, 21 Cal. 3d 604–605; *State* v. *Collins*, 297 A.2d 620, 626 (Me. 1972). The exclusionary rule protects that right by deterring police coercion and by providing a remedy for individual defendants.

The defendant also contends that the voluntariness determination serves his interest in an accurate jury verdict at trial. In this regard, we note that in *State* v. *Staples*, supra, 175 Conn. 405, this court indicated that this is not the primary purpose of the voluntariness inquiry and that the reasonable doubt standard is not mandated in order to satisfy the requirement of proof beyond a reasonable doubt on the ultimate issue of guilt. Without retreating from that position, we acknowledge, however, that the concern that coercion provides a

reason to confess falsely is, nevertheless, a long-standing ground for not receiving coerced confessions into evidence, which is reflected in our own common law precedent. Thus, to the extent that there may be a correlation between involuntariness and falsity, this is a relevant consideration.

We have said that " '[t]he function of the burden of proof employed by the court is to allocat[e] the risk of error between the litigants and indicat[e] the relative importance of the ultimate decision. *Addington* v. *Texas*, 441 U.S. 418, 423, 99 S. Ct. 1804, 1808, 60 L. Ed. 2d 323 (1979). . . . *Cookson* v. *Cookson*, 201 Conn. 229, 234, 514 A.2d 323 (1986).' " *State* v. *Garcia*, 233 Conn. 44, 86, 658 A.2d 947 (1995). "[A] standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. Although the phrases 'preponderance of the evidence' and 'proof beyond a reasonable doubt' are quantitatively imprecise, they do communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions." *In re Winship*, 397 U.S. 358, 370, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Further, the standard of proof influences the "relative frequency . . . of erroneous outcomes"; id., 371; either in favor of the state when the true facts warrant judgment for the defendant or in favor of the defendant when the true facts warrant judgment for the state. Id. "Because the standard of proof affects the comparative frequency of these two types of erroneous outcomes, the choice of the standard to be applied in a particular kind of litigation should, in a rational world, reflect an assessment of the comparative social disutility of each." Id.

The preponderance standard is said to "[require] the trier of fact 'to believe that the existence of a fact is

more probable than its nonexistence before [it] may find in favor of the party who has the burden to persuade the [trier] of the fact's existence"; id., 371–72; and to reflect the view that the "social disutility" of an erroneous decision in either direction is comparable. See id., 371. In contrast, the requirement of proof beyond a reasonable doubt dramatically shifts the risk of an erroneous decision, reflecting the view that it is far worse to make an erroneous decision in favor of one party than it is to make it in favor of the other.

The defendant argues that the value of his right to be free from compulsion to incriminate himself requires imposition of the standard of proof that minimizes, to the greatest extent possible, the risk of an erroneous decision on voluntariness in favor of the state. See *Lego* v. *Twomey*, supra, 404 U.S. 494–95; *State* v. *Jiminez*, supra, 21 Cal. 3d 604–605; *State* v. *Collins*, supra, 297 A.2d 626. We disagree.

The state, of course, currently bears the burden of persuasion on the voluntariness issue, and must convince the trial court by a preponderance of the evidence that the confession sought to be admitted was voluntarily given. Our focus in the present inquiry is, therefore, on any incremental gains to be realized from imposing the higher reasonable doubt standard. As the defendant points out, this determination often turns on the trial court's resolution of conflicting testimony by police and the accused. In such circumstances, we believe, it is only in rare cases that the trial court might be convinced by a preponderance of the evidence that a confession is voluntary but nevertheless harbor a reasonable doubt about the same. Although closing this gap would of course benefit defendants in those cases, we are unpersuaded that it would significantly advance the deterrence function of the exclusionary rule. The greatest part of any deterrent effect of exclusion must, in the first instance, be attributed to requiring the prosecution

to prove, even by a preponderance, that the confession sought to be admitted was not obtained by improper methods. We are not convinced that the exclusion of confessions in very close cases, under the reasonable doubt standard, is likely to produce a significant change in the behavior of police officers in pursuing such evidence. Cf. *Lego* v. *Twomey*, supra, 404 U.S. 489. In this regard, we note that the Supreme Court has indicated that the preponderance standard of proof is sufficient for all determinations of the applicability of an exclusionary rule, which, in its view, is aimed primarily at deterrence. See *Nix* v. *Williams*, 467 U.S. 431, 444–45 n.5, 104 S. Ct. 2501, 81 L. Ed. 2d 371 (1984); see also *Colorado* v. *Connelly*, supra, 479 U.S. 168 (adopting preponderance standard for preliminary question of validity of *Miranda* waiver).

We also are unpersuaded that the relationship between the court's preliminary determination of voluntariness and the accuracy of jury verdicts provides a compelling basis for imposing a higher standard of proof. The defendant's contention, and that of some sister states, that this concern is weighty appears to rest on two premises: first, that involuntary confessions are of *highly* suspect reliability, and second, that juries are likely to accept a confession uncritically. With regard to the first, however, the defendant has not suggested, nor do we perceive, that involuntariness necessarily equates with falsity. Although coercion is reasonably thought to create a reason to confess falsely, whether a particular coerced confession is also likely to be false depends on many variables. Thus, the exclusion of a confession where there is a reasonable doubt about its voluntariness does not invariably mean that a false confession has been suppressed. Furthermore, safeguards against the admission of false confessions other than a stringent burden of proof are already in place. The state must demonstrate the corpus delicti

of the crime to which the defendant has confessed. See *State* v. *Harris*, 215 Conn. 189, 194, 575 A.2d 223 (1990). Additionally, the defendant "has been as free since *Jackson* [v. *Denno*, supra, 378 U.S. 368], as he was before to familiarize a jury with circumstances that attend the taking of his confession, including facts bearing upon its weight and voluntariness." (Internal quotation marks omitted.) *State* v. *Whitaker*, supra, 215 Conn. 757. Before deciding to convict, the jury must determine whether the confession is to be credited, and, if so, whether it is sufficient with any other evidence to demonstrate guilt beyond a reasonable doubt. We have recently reiterated our confidence in the ability of juries to discern the proper weight to be afforded conflicting evidence in this area. See id.

At stake for the state in the application of any exclusionary rule is its interest in efficient, effective law enforcement. The exclusionary rule at issue occasions the loss of otherwise relevant and powerful evidence of guilt, the loss of which might seriously weaken if not decimate a state's case. The cost of the trial court possibly excluding more confessions because of a higher standard of proof is to permit defendants to avoid trial and a just conviction by a jury, when the jury would have the opportunity to consider all of the circumstances under which the confession was elicited and weigh it accordingly. We are not persuaded that any incremental, indirect or speculative benefit that might flow from imposition of the reasonable doubt standard to the voluntariness determination substantially outweighs its increased costs to effective law enforcement and to the truth seeking process. We remain convinced, rather, that the preponderance standard provides a "fair and workable test"; *State* v. *Staples*, supra, 175 Conn. 406; that strikes the appropriate balance, in light of our historical background and contemporary policy concerns, between the various inter-

ests at stake. The preponderance standard, we believe, is "entirely consonant with the general contours of a constitutional safeguard rooted in flexible principles of due process." (Internal quotation marks omitted.) *State v. Joyner*, supra, 225 Conn. 472. We reject the defendant's request to overrule *Staples* and to enshrine, as a constitutional mandate, the highest standard of proof for the preliminary determination of voluntariness.

We turn then to the defendant's claim that the trial court improperly determined that the state had established, under the preponderance standard, that his confession was voluntary. In its decision, the trial court found that when the defendant arrived at the police station, he was advised of his *Miranda* rights, understood those rights and signed the rights advisement card. Shortly thereafter, he voluntarily revealed his real name, his involvement in certain burglaries and the fact that warrants for his arrest had been issued in Florida. Prior thereto he had not asked to leave the station or to speak to an attorney. Further, the court also found that the defendant, after learning that Sebastian had implicated him in the murder, negotiated with police for a favorable disposition, and ultimately agreed to give a statement. Before giving the statement, he was again warned of his *Miranda* rights, which he understood and freely waived. Finally, the court found that the defendant narrated the contents of the written confession to O'Leary between 1:30 p.m. and 3:20 p.m., that he thereafter read each of its pages aloud, acknowledged the truthfulness of its contents, and signed it in the presence of O'Leary and Henderson. The court expressly found the conflicting testimony of the defendant not credible. The court concluded that, on the evidentiary record before it, the state had established, both by a preponderance of the evidence and beyond a reasonable doubt, that, before confessing his involvement, the defendant had been properly warned of and

had validly waived his *Miranda* rights, and that his confession was voluntary.

The defendant appears to challenge the trial court's determination that the confession was voluntary on two grounds: (1) that the findings rest on the police version of the events at the police station, which was not credible; and (2) accepting the police version of events, that the trial court's conclusion that the confession was voluntary was improper. We are unpersuaded.

The defendant's first claim in this regard requires little discussion. The court reasonably credited the police version of the events leading up to the defendant's confession, and we will not retry those credibility determinations on appeal. See *State* v. *Figueroa*, supra, 235 Conn. 179; *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 14, 664 A.2d 719 (1995).

With regard to his second contention, the defendant focuses primarily on the timing and duration of his interrogation. While these factors are clearly relevant to the voluntariness determination, they are not dispositive. See *State* v. *Carter*, 189 Conn. 631, 638, 458 A.2d 379 (1983) (eight hour period of detention before having given third confession, although substantial, "does not remotely approach the length of those interrogations held to be so objectionable on that ground among others as to warrant reversal of a finding by a trial court that a confession was voluntary"); see also *State* v. *DeAngelis*, 200 Conn. 224, 235, 511 A.2d 310 (1986) (ten and one-half hour police interview). Rather, the determination must take into account the totality of the circumstances. See *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 248–49, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). In this case, other relevant factors, such as the defendant's extensive prior experience with the police, his admitted familiarity with his rights not to speak and to have an attorney present, the testimony of the police that he was not

subjected to physical abuse, threats, or deprivation of food or drink, that he was, at times, left alone in an unlocked room, and that he ultimately bargained for favorable treatment if he confessed to his involvement in the crimes before Sebastian did, indicate that the defendant did not confess because his will to remain silent was overborne, but rather that he confessed of his own free will because he believed it would be in his best interest to do so. We conclude, therefore, that the trial court's determination that the state established by a preponderance of the evidence that his confession was voluntary was supported by substantial evidence.

## II

The defendant next claims that his right to due process under the Connecticut constitution was violated by the admission of his written confession at trial because the police had failed to record it electronically. Specifically, he contends that article first, § 8, of the state constitution requires the police, when feasible, to record electronically confessions, interrogations and advisements of *Miranda* rights that occur in places of detention in order for such a confession to be admissible at trial. He argues that because his confession was given at the police station and recording was feasible, the admission of his confession that was not recorded violated his right to due process. The defendant concedes that he did not raise this claim at trial and, therefore, seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[33] We conclude that

[33] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40. "We have also held that we remain free to dispose of the

article first, § 8, does not require electronic recording in order for a confession to be admissible at trial and, therefore, the defendant may not prevail on this claim.

The defendant relies on two elements of state constitutional analysis in support of his claim: sister state decisions and public policy concerns. See *State* v. *Geisler*, supra, 222 Conn. 685; see also footnote 26. The state argues that the recording requirement advanced by the defendant is inconsistent with the practice and precedent in this state regarding the admissibility of confessions and that the tools of analysis relied upon by the defendant do not provide compelling support for such a requirement. We agree with the state.[34]

Electronic recording devices are, of course, a relatively recent technological advancement, and the absence of early historical support for their use in the receipt of confessions by the police is of little relevance to our inquiry. Other analogous means of verifying the accuracy and voluntariness of confessions and waivers of constitutional rights were available, however, at the time of the adoption of our due process clause and thereafter. Chief Justice Swift's commentary on the laws of evidence does not indicate that any form of corroboration of the existence and circumstances of statements made by criminal defendants to police traditionally was required in order for such statements to be admissible at trial; see Z. Swift, A Digest of the Laws of Evidence (1810) p. 131 ("[i]t is a settled rule of common law, that in prosecutions for crimes, the voluntary confession of a prisoner, made to a private person or a magistrate, may be given in evidence against

claim by focusing on whichever condition is most relevant in the particular circumstances." (Internal quotation marks omitted.) *State* v. *Stanley*, 223 Conn. 674, 689, 613 A.2d 788 (1992).

[34] The defendant does not argue that the text of article first, § 8, of the state constitution informs this issue or that federal precedent supports his claim. We therefore focus our analysis on the remaining elements.

him; and if proved by legal testimony, though uncorroborated by any other evidence, is sufficient to convict him"); id., p. 133 (suggesting that confessions may be proved by testimony of party to whom it was made, but that such testimony should be viewed with "[g]reat circumspection"); id., pp. 149–50 (witness giving such testimony "to entitle himself to credit, should be able to give a reasonable and probable account of the manner in which the confession was obtained"); and the defendant points to no authority that suggests that such a requirement existed at common law.

Contemporary decisions of this court provide, by analogy, further support for the state's position that a recording requirement is not required by the state constitution. In *State* v. *Stepney*, 191 Conn. 233, 254, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984), we concluded that all statements made to the state, its agents or other third parties were admissible in evidence as admissions. In several instances, we have expressly refused to limit this general rule by requiring corroboration of the existence and voluntariness of confessions or the waiver of constitutional rights such as the right to counsel or the right to remain silent. For example, although recognizing the relevance of a written waiver to the determination of whether a defendant knowingly and voluntarily has waived his *Miranda* rights, we have refused to require, as a matter of law, that a defendant execute a written waiver of those rights before subsequent incriminating statements may be admitted. *State* v. *Shifflett*, supra, 199 Conn. 733. We have similarly refused to require that there be a corroborative witness to a defendant's oral waiver of his *Miranda* rights. See *State* v. *Whitaker*, supra, 215 Conn. 756; *State* v. *Bartee*, 167 Conn. 309, 313, 355 A.2d 250 (1974) (defendant's oral statement given to police officer at hospital bedside was admissible after defendant, according to officer's

testimony, had orally waived rights). Moreover, we have rejected a requirement that a confession be in writing in order for it to be admissible; see *State* v. *Frazier*, 185 Conn. 211, 225, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982); or a requirement that a confession be witnessed by someone other than the police officer taking the statement in order for it to be admissible. *State* v. *Whitaker*, supra, 757.

Rather than establishing per se rules of corroboration for the admissibility of confessions, we consistently have allowed the trier of fact to consider the circumstances of the confession, including any lack of corroboration, in determining the weight, if any, to be afforded that particular piece of evidence. Id. "[T]he absence of testimony confirming that of a single witness to a confession may become highly significant with respect to the weight given to a confession by the arbiter of guilt. 'A defendant has been as free since *Jackson* [v. *Denno*, supra, 378 U.S. 368], as he was before to familiarize a jury with circumstances that attend the taking of his confession, including facts bearing upon its weight and voluntariness. In like measure, of course, juries have been at liberty to disregard confessions that are insufficiently corroborated or otherwise deemed unworthy of belief.' *Lego* v. *Twomey*, [supra, 404 U.S. 485–86]." *State* v. *Whitaker*, supra, 215 Conn. 757. Our history and precedents, therefore, do not support the defendant's claim.

The defendant also finds little support for his claim in the case law of other jurisdictions. Of the several states that have considered the issue, only one state, Alaska, has concluded that electronic recording of confessions, where feasible, is required under its state constitution's due process provision. *Stephan* v. *State*, 711 P.2d 1156, 1159 (Alaska 1985). The Supreme Court of Minnesota adopted a recording requirement pursuant

to its supervisory power, but did not reach the issue under the state constitution. *State* v. *Scales*, 518 N.W.2d 587 (Minn. 1994). The remaining states that have decided the question of the electronic recording of confessions as a matter of state constitutional law have unanimously rejected such a requirement.[35]

The focus of the defendant's claim is a public policy argument that recording is a means to attain a desirable level of certainty that confessions are voluntarily made and accurately reported by the relevant witnesses. As we recognized earlier, the private interest affected by the voluntariness determination is substantial. The defendant's argument is essentially that, in the absence of a recording requirement, his right to exclude an involuntary confession from trial is not adequately protected because, without a recording, the voluntariness determination often hinges upon the outcome of a "swearing contest" between the accused and the police, which contest is almost invariably resolved in favor of the police. He argues further that recording confessions and interrogations constitutes a "foolproof" way to resolve accurately factual disputes about the relevant events and that the financial costs of compliance are not unduly burdensome. He claims, therefore, that recording is required as a matter of due process under the state constitution.

Initially, although we concur with the defendant that electronic recording "would, in many cases, be a helpful tool in evaluating the voluntariness of confessions"; *Commonwealth* v. *Fryar*, supra, 414 Mass. 742 n.8; we

[35] See *Dill* v. *State*, 600 So. 2d 343 (Ala. Crim. App. 1991); *People* v. *Raibon*, 843 P.2d 46 (Colo. App. 1992); *State* v. *Rhoades*, 119 Idaho 594, 809 P.2d 455 (1991); *People* v. *Everette*, 187 Ill. App. 3d 1063, 543 N.E.2d 1040 (1989); *State* v. *Buzzell*, 617 A.2d 1016 (Me. 1992); *Commonwealth* v. *Fryar*, 414 Mass. 732, 610 N.E.2d 903 (1993); *Williams* v. *State*, 522 So. 2d 201 (Miss. 1988); *Jiminez* v. *State*, 105 Nev. 337, 775 P.2d 694 (1989); *State* v. *James*, 858 P.2d 1012 (Utah App. 1993); *State* v. *Gorton*, 149 Vt. 602, 548 A.2d 419 (1988); *State* v. *Spurgeon*, 63 Wash. App. 503, 820 P.2d 960 (1991); *State* v. *Williams*, 190 W. Va. 538, 438 S.E.2d 881 (1993).

also agree with the state that recording would not in all circumstances be a foolproof mechanism for accurately resolving disputes between an accused and the police as to the circumstances surrounding a confession. For example, there might, despite a recording, be disputes concerning what transpired before the recording began or during breaks in the interview when the suspect is not being recorded, such as when the suspect uses the bathroom; cf. *State* v. *Mercer*, 208 Conn. 52, 65–72, 544 A.2d 611 (1988) (although interview at police station recorded, dispute as to occurrences while police transported defendant from outside of state); or on occasions when the tape recording may be inaudible or partially so. See *State* v. *Roseboro*, 221 Conn. 430, 443, 604 A.2d 1286 (1992).

More importantly, however, we are not prepared to accept the fundamental premise of the defendant's argument that reliance on the trial court to resolve factual issues from the testimony of persons familiar with the events at issue, is, in this context, unacceptable as measured by the flexible concepts of due process. We are not persuaded that determinations of admissibility traditionally made by trial courts are inherently untrustworthy or that independent corroboration of otherwise competent testimonial or documentary evidence regarding the existence and voluntariness of a confession is necessary to comport with constitutional due process requirements.

Finally, the defendant identifies the state's only burden arising from the recordation of confessions to be the costs of purchasing and maintaining recording equipment. While these costs might be substantial, there are also other "costs" associated with such a requirement. Requiring the police to record all confessions and interrogations in places of detention might severely inhibit the police in pursuing, by constitutionally valid methods, confession evidence. Moreover, a criminal

suspect's knowledge that an interview with the police will be recorded might limit his or her willingness to speak with the police. We have noted that it is " 'a common experience of life that in many circumstances persons are willing to convey information orally but are reluctant to put the same thing in writing.' " *State* v. *Frazier*, supra, 185 Conn. 225; see also *United States* v. *Cooper*, 499 F.2d 1060, 1062 (D.C. Cir. 1974) (same). Similarly, a criminal defendant may be more forthcoming when speaking to the police without the presence of a tape recorder or video camera. Moreover, in addition to the costs associated with compliance with a recordation requirement, the cost of noncompliance with the rule advanced by the defendant, due to negligence or for other reasons, is the loss of otherwise admissible, probative evidence of guilt.

In sum, although we agree with the defendant that the recording of confessions and interrogations generally might be a desirable investigative practice, which is to be encouraged, we are not persuaded, in light of our history, precedent and the flexible notions of due process, that conditioning the admissibility of confessions on their recording is a requirement of due process under the state constitution. We, therefore, reject the defendant's claim.[36]

---

[36] The defendant also urges this court, if it concludes that recordation is not constitutionally required, to suppress his confession pursuant to its supervisory authority over the administration of justice. This claim—that we should mandate that the police make and preserve corroborative evidence as a condition to the state's use at trial of an otherwise admissible confession—implicates the proper boundaries of our supervisory authority, the exercise of which traditionally has been addressed to the conduct of judicial actors. See, e.g., *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995) (directing trial courts to hold preliminary hearing whenever presented with allegations of jury misconduct in criminal cases, regardless of whether hearing is requested by counsel); *State* v. *Breton*, 235 Conn. 206, 250, 663 A.2d 1026 (1995) (directing language of special verdict form in capital sentencing hearing); *State* v. *Patterson*, 230 Conn. 385, 397–98, 645 A.2d 535 (1994) (directing personal judicial supervision of voir dire); *State* v. *Holloway*, 209 Conn. 636, 645–46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078,

## III

The defendant's last claim is that there was insufficient evidence to support his conviction. He argues that the written confession was the only evidence that connected him to the break-in and death of the victim, and that the confession was not sufficiently reliable to support his conviction. We disagree.

The standard of review employed in a sufficiency of the evidence claim is well settled. "[W]e apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . State v. Greenfield, [supra, 228 Conn. 76]." (Internal quotation marks omitted.) State v. Mejia, 233 Conn. 215, 223, 658 A.2d 571 (1995). "While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. State v. Castonguay, 218 Conn. 486, 507, 590 A.2d 901 (1991). If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination

104 L. Ed. 2d 643 (1989) (directing inquiry by trial court into bias claims on voir dire). In support of this claim, the defendant has simply referenced Practice Book § 4183 and otherwise relies on the policy considerations advanced in his constitutional argument. Because, however, he has failed to provide any analysis of the significant issues involved in such an expansive exercise of our supervisory authority, we conclude that he has failed to brief and analyze adequately this claim and, accordingly, we decline to review it. See State v. Bruce, 234 Conn. 194, 215, 662 A.2d 107 (1995) (court may decline to review claims where petitioner has not properly briefed and analyzed them).

with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. *State* v. *Grant*, 219 Conn. 596, 604–605, 594 A.2d 459 (1991)." *State* v. *Pinnock*, 220 Conn. 765, 771, 601 A.2d 521 (1992). "[W]e must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Mejia*, supra, 224.

The defendant correctly asserts that the only issue in contention at trial was the identity of the perpetrator of the break-in and murder. The state presented substantial evidence to show that the defendant had voluntarily and truthfully confessed to his involvement in those crimes. The police officers who had questioned the defendant testified that he had voluntarily divulged his involvement in the break-in and murder after Sebastian implicated him in those crimes. The police officers denied having threatened the defendant with Fraser's arrest or having prepared the written statement from sources other than the defendant's own statements. Furthermore, the confession contained several accurate details regarding the condition of the victim's apartment, the location of her body and the nature of her injuries.

The defendant testified in his own defense, claiming that he had not participated in the break-in and murder, and that he had never admitted to doing so. He claimed that on January 12, 1993, he had been in the company of Fields and Sebastian's mother from approximately 7:30 p.m. to 8:30 p.m., and that he had then visited

Sebastian and Danielle Konopelski, Sebastian's girl-friend, at their apartment, which was next door to his own, from approximately 8:30 p.m. until 11:45 p.m. He claimed that at 11:45 p.m., he had gone home to the apartment he shared with Fraser, where he remained until the next morning. Fraser admitted that she had not seen the defendant between 7:30 p.m. and 11:45 p.m. when he returned to their apartment, but testified that she had spoken by telephone to him several times during that interval while he was at Konopelski's apartment. Konopelski testified that the defendant was in her apartment during the evening of January 12, 1993, but admitted on cross-examination, however, that the defendant and Sebastian were outside throughout the day and evening of January 12, 1993, that they were out of her sight during the evening, that Sebastian had not come inside until 10:30 p.m., and that the defendant had not come into her apartment until shortly after Sebastian did.

The defendant also presented evidence to show that the victim's injuries had occurred after 4 a.m. on January 13, 1993. Dean Uphoff, a pathologist who had examined the victim's brain, testified that, under normal conditions, the body's healing response would cause certain white blood cells to migrate to the site of an injury within six to eight hours of infliction, and that, based on the absence of those cells at the site of the victim's head injuries, it was his opinion that her injuries had occurred six to eight hours or less before her death at 12:30 p.m. on January 13, 1993. Uphoff admitted on cross-examination, however, that hypothermia could cause the body's healing response to slow down, thereby resulting in fewer white blood cells at the site of the injuries than ordinarily expected. He also agreed that the victim had been hypothermic when she had arrived at the hospital on January 13, 1993, and that

her condition could change his estimate of the time of injury to twelve to fourteen hours before her death.

With regard to the confession, the defendant testified at trial that he had been forcibly removed from his home in the early morning of January 15, 1993, and brought to the police station, where he was questioned for several hours. He claimed that he had consistently denied involvement in the break-in and murder, and that a police officer had shown him photographs of the crime scene. Detective Mancinelli testified, however, that the photographs taken of the crime scene by the forensic photographer had not been developed by January 15, 1993. The defendant also testified that, after several hours, he was threatened by the police that they would arrest Fraser and take her children into state custody if he did not "cooperate," and that, to avoid Fraser's arrest, he had signed the typewritten confession. He claimed that he did not provide the information contained in the confession, and he offered evidence, through cross-examination of several police officers, to show that the police officers who had prepared the statement had known the information contained in it regarding the crime scene before he was brought to the station for questioning.

The jury rejected the defendant's testimony that he had not made the confession offered by the state, and that he had not been involved in the break-in and the victim's death. Its determination required primarily the resolution of credibility issues, a function uniquely entrusted to the jury as finder of fact. We cannot say that the jury could not reasonably have disbelieved the testimony of the defendant and his witnesses, and believed the testimony of the police officers that the defendant had provided them with the contents of the written confession based on his own knowledge of the

crime. The jury, therefore, reasonably could have found beyond a reasonable doubt that the defendant was guilty.

The judgment is affirmed.

In this opinion PETERS, C. J., and CALLAHAN, BORDEN and PALMER, Js., concurred.

KATZ, J., concurring. I agree with part II of Justice Berdon's dissent that the state should be required to prove that the defendant's confession was voluntary beyond a reasonable doubt. The trial court in this case, however, did determine that, even under this heightened standard, the defendant's confession was voluntary.

Accordingly, I concur in the result.

BERDON, J., dissenting. Our state constitution provides that "[n]o person shall be compelled to give evidence against himself . . . ." Conn. Const., art. I, § 8. This constitutional guarantee is a fundamental tenet of our democracy. Its roots go back to the ancient Hebrew law " 'that no man is to be declared guilty on his own admission . . . .' "[1] *Miranda* v. *Arizona,* 384 U.S. 436, 458 n.27, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The policies supporting the privilege against self-incrimination "point to one overriding thought: the constitutional foundation underlying the privilege is the respect a government—state or federal—must accord to the dignity and integrity of its citizens." Id., 460. Today, this court,

---

[1] "Thirteenth century commentators found an analogue to the privilege grounded in the Bible. 'To sum up the matter, the principle that no man is to be declared guilty on his own admission is a divine decree.' Maimonides, Mishneh Torah (Code of Jewish Law), Book of Judges, Laws of the Sanhedrin, c. 18, ¶ 6, III Yale Judaica Series 52–53. See also Lamm, The Fifth Amendment and Its Equivalent in the Halakhah, 5 Judaism 53 (Winter 1956)." *Miranda* v. *Arizona,* 384 U.S. 436, 458 n.27, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

by merely requiring proof by a preponderance of the evidence that the out-of-court confession of the accused is voluntary, strips this constitutional guarantee to its bare bones.

## I

In this case, the defendant, Anthony James, has consistently claimed that his confession was coerced. He claims that it was a document prepared by the police based largely on another person's confession. The defendant testified that his signature on the confession was obtained by the police after he was held and continuously questioned for almost fourteen hours, during which he was threatened that his fiancee, Carolyn Fraser, would be arrested and his children placed in foster care. The state disputes much of the defendant's allegations, and claims that the questioning took place over "several hours," as characterized by the majority of this court. The state, however, acknowledges that the defendant was awakened by the police at 1:30 a.m. on January 14, 1993, removed from his home and brought to the police station, whereupon he was questioned until 3:30 p.m. that day. During this time, the police admit that the defendant had almost nothing to eat or drink, and that he did not sleep. They also admit that he was presented with a written copy of Michael Sebastian's confession at approximately 5:30 a.m., who was undergoing questioning regarding the same crime in another room at the police station, and that the defendant continued to deny any participation in the crime until at least 11 a.m. It stretches the imagination that, under the facts of this case, the confession was voluntary. A finding, under any standard, that there was no police coercion cannot stand. We have no tape recordings, videotapes or any other independent record of what occurred during those fourteen hours at the

police station. The testimony of the defendant, Fraser, and another witness, Selma Haddad,[2] however, which

[2] The defendant provided the following account of his testimony at the suppression hearing: "[A]t approximately 1 a.m. on January 15, 1993, he heard a banging at the door and someone saying it was the Waterbury police. He threw on some shorts and cracked the door open. The police said 'open the door and kind of like pushed it in.' Four officers came through the front door with guns drawn. The defendant was frightened and obeyed the order to sit on the couch. One of the officers, [Sergeant Neil] O'Leary, asked the defendant where Michael Sebastian was. The defendant responded 'don't tell me Mike had something to do with that murder.' The reason the defendant said this is the police had questioned him earlier about Sebastian's whereabouts the night the lady was killed. The officers never gave the defendant any more information about why they had come into his house at 1:30 a.m. The defendant was confused and frightened and felt that he was being arrested for murder. He was told to get dressed and was ordered to do so in the living room. He was not free to move around the apartment. 'They never really said the reason they were there. They told me I had to go with them downtown. I was taking a ride.' After he was dressed, the defendant was allowed to kiss the baby goodbye, in the presence of two detectives, one of whom had his gun drawn. The defendant was escorted out the front door to the landing where he was handcuffed before he was taken down the stairs and put into the back of a police car. The defendant did not ask to get out of the cruiser because 'I felt that I was being arrested.' At the station he was put in a small room with Detective [James] Egan and [Sergeant Robert] Henderson. He was told to explain how he and Mike had murdered the lady down the street. When the defendant started to protest and swear, Henderson hit him across the face, admonished him not to talk that way in his house and asked him if he understood his rights. The defendant responded: 'Yes, I do and I'd like to have a lawyer present." He said, 'Do you have one?' I said 'no.' He said, 'Well, no public defender is going to come down here this time of night.' At this point the defendant was 'very scared to death and pretty emotional.' He did not ask to leave because he felt they would not allow that based on the fact that he had been refused permission to leave the room to use the lavatory, and so had to urinate in a trash can. Over the next several hours the defendant repeatedly denied involvement in either the [Pauline] Grincunas homicide or neighborhood burglaries perpetrated with Joe Fields and Sebastian. He did admit to breaking into one plumbing place with Sebastian and volunteered to take a lie detector test. Around 6:30 or 7 a.m., the defendant was moved to another interrogation and shown Sebastian's statement, which named the defendant as the murderer. The police also showed him pictures of what they said was the crime scene and urged him to tell what he knew of Sebastian's involvement.

"Around 7:30 or 8 a.m., the defendant tried to take a snooze. He was very tired and had not had any sleep since the previous night. A detective woke him and warned that there was no sleeping allowed in this jail. Around 9 a.m., the defendant was told that Fraser was going to be arrested for harboring a fugitive based on the defendant's bad check charges from Florida. A half

is at odds with the police account, if true, would constitute the modern day equivalent of the rack and screw.

hour later, O'Leary returned with a piece of paper which he told the defendant was an arrest warrant for Fraser. Ultimately, the defendant signed and initialed a confession. The defendant had no part in the giving of the statement and never, in fact, confessed. Instead, he signed an already completed and typed confession in order to prevent Fraser's arrest. He denied ever being given *Miranda* rights over the course of the fourteen hour interrogation, and testified that he did not sign the *Miranda* card until after the police had extracted his signature on the confession they wrote up. The contents of the confession regarding his involvement in the murder were untrue."

The defendant provided the following account of Fraser's testimony at the suppression hearing: "Carolyn Fraser contradicted the police account of a friendly dead-of-night visit by four armed detectives — two covering each door. She and the defendant were in bed during the early morning hours of January 15, 1993, when, at about 1:15 a.m., there was a loud banging on the door. The defendant got up and asked who was there. She heard someone say, 'Waterbury police.' The defendant, who was not dressed, grabbed some shorts and started to open the door, at which point two officers pushed their way in. They ordered the defendant to sit on the couch and told Fraser to get out of bed and sit there with him. Four detectives came through the front door and two uniformed officers came through the back door. They asked the defendant where Sebastian was and told him 'they wanted to take him for a ride downtown.' After the police checked the defendant's clothes, they had him dress in the living room. When the defendant asked to kiss the baby goodbye, he was escorted into the bedroom while one of the officers held his gun out. They took the defendant out the front door. As Fraser looked out the front window, she saw the defendant leaning chest up against the police car with his hands behind his back. Two detectives, [James] Griffin and [William] Cassada, remained in the apartment with her. Detective Griffin told Fraser that if she knew anything about what the defendant had done, she had better cooperate or she would be arrested and her children placed in foster care. Distraught, Fraser called her friend Selma Haddad and asked her to come over so that there would be someone with the children in the event Fraser was arrested."

The defendant provided the following account of Haddad's testimony at the suppression hearing: "Selma Haddad testified that when she arrived and knocked on the apartment door, it was opened by an acquaintance of hers, Detective Sergeant Jim Griffin. After calming Fraser's children, who had been upset by all the commotion, Haddad asked Griffin what was going on. Griffin told her that if Fraser 'doesn't cooperate with everything we want, she's going to be arrested and her kids will go to [the department of children and youth services].' Haddad said that although there were two officers inside the apartment and several police officers who went in and out over a several hour time span, Griffin was the only one she knew by name. She remained at the apartment until morning when she left, first to get coffee, and shortly thereafter to go to work around 8 a.m."

In my view, as a matter of public policy the police should, from the time a citizen is first taken into the police station for investigative purposes, whether voluntarily or involuntarily, electronically record all that transpires with respect to the person as long as he or she is there.[3] Such a procedure would benefit the police by dispelling any claims of coercion with respect to confessions and admissions obtained from the accused. Equally important, the suspect and the public would perceive that justice had been done. Lacking such independent verification, it strains credulity that the defendant would voluntarily go to the police station at 1:30 a.m. at the "invitation" of the police and voluntarily remain there for fourteen hours. We cannot ignore as judges what we know as men and women.

Although there is a claim of physical abuse in this case, our concern, as Chief Justice Warren wrote in *Miranda*, has moved away from the police's resort "to physical brutality—beatings, hanging, whipping . . . ." *Miranda* v. *Arizona*, supra, 384 U.S. 446. Rather, "the modern practice of in-custody interrogation is psychologically rather than physically oriented." Id., 448. Relying on "various police manuals and texts which document procedures employed with success in the past, and which recommend various other effective tactics"; id.; Chief Justice Warren in *Miranda* then described the various psychological procedures used by the police to extract a confession, including isolation, the "principal psychological factor contributing to a successful interrogation . . . ." (Internal quotation marks omitted.) Id., 449. In addition to isolation, police manuals referred to the importance of unfamiliar and

---

[3] I agree with the majority that our state constitution's due process clause does not require electronic recording. Although I urge the police to voluntarily make such recordings from the moment the accused enters the police station until such time as all interrogation terminates, I leave to another day whether we should require this under our supervisory authority over the administration of justice.

police dominated surroundings; id., 449–50; a police display of confidence in the suspect's guilt; id., 450; "an oppressive atmosphere of dogged persistence" where the subject is "interrogate[d] for a spell of several hours pausing only for the subject's necessities in acknowledgement of the need to avoid a charge of duress that can be technically substantiated"; (internal quotation marks omitted) id., 451; the offering of legal excuses for the suspect's actions in order to obtain an initial admission of guilt, the "Mutt and Jeff" act; id., 451–52; the inducement of confessions by trickery; id., 453; and the giving of false legal advice. Id., 455. A bare recitation of the events in the present case beginning with the knock on the defendant's door at 1:30 a.m. on January 14, through his confession given fourteen hours later, could have come straight out of these law enforcement manuals.

"It is obvious that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner. This atmosphere carries its own badge of intimidation. To be sure, this is not physical intimidation, but it is equally destructive of human dignity. The current practice of incommunicado interrogation is at odds with one of our Nation's most cherished principles—that the individual may not be compelled to incriminate himself. Unless adequate protective devises are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." Id., 457–58.

I have elsewhere stated that: " 'Although we normally give great deference to the factual findings of the trial court, the ultimate issue of whether the statement is voluntary and admissible is a legal determination. *Arizona* v. *Fulminante*, 499 U.S. 279, 287, 111 S. Ct. 1246, 113 L. Ed. 2d 302, reh. denied, 500 U.S. 938, 111 S. Ct. 2067, 114 L. Ed. 2d 472 (1991).' *State* v. *Roman*, 224

Conn. 63, 76–77, 616 A.2d 266 (1992) (*Berdon, J.,* dissenting), cert. denied, 507 U.S. 1039, 113 S. Ct. 1868, 123 L. Ed. 2d 488 (1993). 'On appeal, in order to determine whether the defendant's constitutional rights have been infringed, we review the record in its entirety and are not limited to the evidence before the trial court at the time the ruling admitting the statements was made.' *State* v. *Toste,* 198 Conn. 573, 576, 504 A.2d 1036 (1986). Indeed, our examination of the record must be 'independent and scrupulous' when determining whether a confession is admissible. *State* v. *Smith,* [200 Conn. 465, 478, 512 A.2d 189 (1986)]. 'Accordingly, our standard of review is not whether the fact-finding of the trial court is "clearly erroneous," but whether, upon our review of the record, the state has proven that the incriminating statements were voluntarily made.' *State* v. *Roman,* supra, 77." *State* v. *Medina,* 228 Conn. 281, 324, 636 A.2d 351 (1994) (*Berdon, J.,* dissenting).

On the basis of the facts of this case—whether the standard for the burden of persuasion on the part of the state to prove the voluntariness of a confession is by a preponderance of the evidence or beyond a reasonable doubt—I would find that the confession was coerced, and order that it be suppressed at a new trial.

## II

I would also hold that, under our state constitution, the state must prove that the confession of an accused is voluntary beyond a reasonable doubt. I start my state constitutional analysis with the underlying policy reasons for determining which of the burdens of persuasion are applicable. Burdens of proof are allocated upon the willingness of society to accept the risk of an erroneous determination. For example, "[w]e permit proof by a preponderance of the evidence in civil litigation because we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor

than for there to be an erroneous verdict in the plaintiff's favor." (Internal quotation marks omitted.) *Lego* v. *Twomey*, 404 U.S. 477, 493, 92 S. Ct. 619, 30 L. Ed. 2d 618 (Brennan, J., dissenting).

On the other hand, in a criminal matter we require proof beyond a reasonable doubt. The Supreme Court of the United States pointed out in *In re Winship*, 397 U.S. 358, 363, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970), that the reasonable doubt standard "is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence . . . ." As Justice Harlan stated in his concurring opinion, "the requirement of proof beyond a reasonable doubt in a criminal case [is] bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." Id., 372.

I am unwilling to accept the risk of an erroneous determination that the confession was voluntary when in fact it may have been coerced. "If we permit the prosecution to prove by a preponderance of the evidence that a confession was voluntary, then, to paraphrase Mr. Justice Harlan, we must be prepared to justify the view that it is no more serious in general to admit *involuntary confessions* than it is to exclude *voluntary confessions*. . . . Compelled self-incrimination is so alien to the American sense of justice that I see no way that such a view could ever be justified." *Lego* v. *Twomey*, supra, 404 U.S. 494 (Brennan, J., dissenting).

The majority today places a confession on the same level as any other evidential ruling during the course of a trial. This fails to recognize that confessions are "a special type of evidence." *State* v. *Trammell*, 240 Neb. 724, 736–37, 484 N.W.2d 263 (1992); *State* v. *Phinney*, 117 N.H. 145, 147, 370 A.2d 1153 (1977). As the

*Phinney* court recognized: "Confessions are usually obtained in the psychological atmosphere of police custody and in the greatest secrecy in which the cards can be stacked against the accused. He has no means of combating the evidence produced by the police save by his own testimony. The stakes are too high and the risk of error too great to permit a determination of admissibility to be decided by a balance of probabilities." *State* v. *Phinney,* supra, 147.

The need for the heightened standard of proof beyond a reasonable doubt that a confession was voluntary is underscored by a fundamental principle of our criminal justice system—that no one shall be found guilty of a crime except upon proof of every element of the crime beyond a reasonable doubt. *In re Winship,* supra, 397 U.S. 364. Anyone who has had any experience with the criminal justice system and the trial of a criminal case—either as a judge or trial counsel—knows that the confession once admitted is tantamount to conviction. *State* v. *Phinney,* supra, 117 N.H. 147 (acceptance of confession "basically amounts to conviction"). Because our system of justice is predicated on the reasonable doubt standard, it then logically follows that the voluntariness of a confession must be established by proof beyond a reasonable doubt.

There is also another practical aspect of this issue that cannot be overlooked. In most instances the decision as to whether the confession is to be admitted into evidence is usually based on the credibility of the police officer and the defendant.[4] The trial judge having this

---

[4] "In making this determination [of whether the confession was in fact voluntarily rendered], the trial court will often have to decide which one of two self-serving accounts to believe, as the testimony presented at a . . . hearing ordinarily consists of conflicting versions by the defendant and law enforcement officers as to what occurred during the interrogation of the defendant by those officers which led to the defendant's confession. (See *Lego* v. *Twomey,* supra, [404 U.S. 492 (Brennan J., dissenting)].) In light of the factual nature of this inquiry, the degree of certainty as to which a trial

choice is more apt to believe the police officer as opposed to the defendant. Although the vast number of police officers are dedicated public servants concerned with justice, there are some who may not be so reliable. See *State* v. *Peters*, 315 So. 2d 678, 683 (La. 1975) (general allegations by police officers that no force was used in eliciting purported confession insufficient to prove beyond reasonable doubt that inculpatory statement was obtained freely and voluntarily in face of defendant's witnesses supporting defendant's declaration of physical coercion and physical evidence of such coercion). For this reason alone the standard must be reasonable doubt.

With these policy reasons in mind, I continue with my state constitutional analysis. "It is well established that federal constitutional . . . law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . Moreover, we have held that [i]n the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort. . . . In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut citizens have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration,

court must be convinced that a confession is voluntary will often be of controlling significance. (Id., [492].) Thus, under the preponderance of the evidence test, a trial court will more often resolve factual conflicts in the evidence in favor of admitting a challenged confession, and this will correspondingly increase the risk that some involuntary confessions will thereby be admitted. The contrary result would obtain, however, if the reasonable doubt standard were applied, and this would thus decrease the risk that involuntary confessions would be admitted. (Id., [493].)" *People* v. *Jimenez*, 21 Cal. 3d 595, 606, 580 P.2d 672, 147 Cal. Rptr. 172 (1978).

but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law. . . . Recognizing that our state constitution is an instrument of progress . . . is intended to stand for a great length of time and should not be interpreted too narrowly or too literally . . . we have concluded in several cases that the state constitution provides broader protection of individual rights than does the federal constitution." (Citation omitted; internal quotation marks omitted.) *State* v. *Miller*, 227 Conn. 363, 379–80, 630 A.2d 1315 (1993); *State* v. *DeFusco*, 224 Conn. 627, 631–32, 620 A.2d 746 (1993); *State* v. *Marsala*, 216 Conn. 150, 171, 579 A.2d 58 (1990); *State* v. *Dukes*, 209 Conn. 98, 112, 547 A.2d 10 (1988); see also *State* v. *Joyce*, 229 Conn. 10, 15–16, 639 A.2d 1007 (1994). Indeed, in *Lego* v. *Twomey*, supra, 404 U.S. 489, the majority of the United States Supreme Court in that four to three decision[5] holding that the state need only prove the voluntariness of the confession by the fair preponderance standard under the federal constitution, took the unusual step of inviting the states to set a higher standard: "States are free, pursuant to their own law, to adopt a higher standard. They may indeed differ as to the appropriate resolution of the values they find at stake."

This court, today, relies on *State* v. *Staples*, 175 Conn. 398, 399 A.2d 1269 (1978), for the precedent that merely a preponderance of the evidence is required. It is correct that in *Staples*, the court held under the state constitution "that a trial court should follow the preponderance of the evidence standard and not the reasonable doubt standard in determining whether or not the state has sustained its burden of proving voluntariness when a confession of a criminal defendant is offered into evidence." Id., 406–407. *Staples*, however, is not binding precedent for two reasons.

---

[5] Two justices did not participate in *Lego*.

First, this court did not conduct an independent analysis of the Connecticut constitution in *Staples*. Indeed, in that case, the court relied on *State* v. *Bartee*, 167 Conn. 309, 313, 355 A.2d 250 (1974), which in turn relied solely on federal precedent to decide the federal question before the court. The question of the proper burden of proof in determining the voluntariness of a confession under the Connecticut constitution has since eluded us. See, e.g., *State* v. *Medina*, supra, 228 Conn. 300; *State* v. *Stanley*, 223 Conn. 674, 689–90, 613 A.2d 788 (1992).

Second, *Staples* was decided in an era when no independent meaning was given to those provisions of the state constitution that paralleled those of the federal constitution. For example, for years this court held that the due process provisions of the federal and state constitutions have the same meaning and impose similar limitations. *State* v. *Brigandi*, 186 Conn. 521, 542, 442 A.2d 927 (1982); *Caldor's, Inc.* v. *Bedding Barn, Inc.*, 177 Conn. 304, 314, 417 A.2d 343 (1979); *Roundhouse Construction* v. *Telesco Masons Supplies*, 168 Conn. 371, 374, 362 A.2d 778, vacated, 423 U.S. 809, 96 S. Ct. 20, 46 L. Ed. 2d 29 (1975), aff'd on remand, 170 Conn. 155, 365 A.2d 393, cert. denied, 429 U.S. 889, 97 S. Ct. 246, 50 L. Ed. 2d 172 (1976); *Katz* v. *Brandon*, 156 Conn. 521, 537, 245 A.2d 579 (1968); *Cyphers* v. *Allyn*, 142 Conn. 699, 703, 118 A.2d 318 (1955); *State ex rel. Brush* v. *Sixth Taxing District*, 104 Conn. 192, 195, 132 A. 561 (1926). Pursuant to an appropriate state constitutional analysis, however, we have determined that our state due process provision provides greater protection for the criminal defendant. *State* v. *Morales*, 232 Conn. 707, 726–27, 657 A.2d 585 (1995) (rejecting federal litmus test of good or bad faith of police in failing to preserve potentially useful evidence, state due process clause requires trial court to employ balancing test that weighs reasons for unavailability of evidence

against degree of prejudice to accused); *State* v. *Stoddard*, 206 Conn. 157, 166, 537 A.2d 446 (1988) (rejecting federal constitutional precedent by holding that due process clause of Connecticut constitution requires police to inform suspect of timely efforts by counsel to provide pertinent legal assistance). Accordingly, notwithstanding *Staples*, in my view, we write on a clean slate.

In addition to the sociological and public policy reasons I have heretofore discussed, we look to the state's common law before the adoption of the Connecticut constitution in 1818 to aid in interpreting our state constitution. *State* v. *Oquendo*, 223 Conn. 635, 650, 613 A.2d 1300 (1992). When doing so, however, we have held that the historical analysis must be tempered with a contemporary meaning. *State* v. *Dukes*, supra, 209 Conn. 114–15 ("Constitutional provisions must be interpreted within the context of the times. . . . The Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." [Citations omitted; internal quotation marks omitted.]).

As I pointed out in my dissenting opinions in both *Medina* and *Stanley*, valid and compelling historical reasons exist to require under the state constitution that the state has the burden of proving that a confession is voluntary beyond a reasonable doubt. In my analysis in those cases, I noted that the "value the framers of our state constitution placed on the right to remain silent is evident and important in determining the contours of the state constitutional protection. *State* v. *Geisler*, [222 Conn. 672, 685, 610 A.2d 1225 (1992)]. Zephaniah Swift, a leading jurist . . . of 1818, wrote in his treatise on the law that 'the confession must be perfectly voluntary: for if the *least degree of influence*

appear to be exercised over the prisoner's mind, to induce him to disclose his guilt, the whole will be rejected.' . . . 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823) p. 408. Justice Swift also pointed out in his treatise on evidence that voluntary confessions 'are deemed to be the most conclusive evidence . . . .' Z. Swift, A Digest on the Law of Evidence (1810) p. 133. He noted, however, that '[t]here is, perhaps, no part of evidence in which there is so much misrepresentation and fabrication, as in testifying to the confession of a party.' Id., p. 149." (Emphasis in original.) *State* v. *Stanley*, supra, 223 Conn. 698–99 (*Berdon, J.,* dissenting). Indeed, in "this state the salutary principle embodied in the constitution—that no man is bound to criminate himself—has ever been rigidly adhered to." *State* v. *Coffee*, 56 Conn. 399, 415, 16 A. 151 (1888).

General "[c]ommon law precedent also leads me to the conclusion that our state constitution requires a higher standard of proof of voluntariness of a confession. E. Peters, 'Common Law Antecedents of Constitutional Law in Connecticut,' 53 Alb. L. Rev. 259, 263 (1989). Blackstone, in formally shaping the contours of our common law, wrote: '[I]ndeed, even in cases of felony at the common law, [confessions] are the weakest and most suspicious of all testimony; ever liable to be obtained by artifice, false hopes, promises of favor, or menaces; seldom remembered accurately, or reported with due precision; and incapable in their nature of being disproved by other negative evidence.' 4 W. Blackstone, Commentaries on the Laws of England (1807) p. 357." *State* v. *Stanley*, supra, 223 Conn. 699 (*Berdon, J.,* dissenting).

Every state but one in the northeast has adopted a standard of proof in excess of the preponderance of the evidence to determine the voluntariness of a confession. See *State* v. *Collins*, 297 A.2d 620 (Me. 1972) (reasonable doubt); *Commonwealth* v. *Mandile*, 397 Mass.

410, 492 N.E.2d 74 (1986) (same); *State* v. *Benoit*, 126 N.H. 6, 490 A.2d 295 (1985) (same); *State* v. *Franklin*, 52 N.J. 386, 245 A.2d 356 (1968) (same); *People* v. *Huntley*, 15 N.Y.2d 72, 204 N.E.2d 179, 255 N.Y.S.2d 838 (1965) (same); *State* v. *Arpin*, 122 R.I. 643, 410 A.2d 1340 (1980) (clear and convincing). Other states have also come to the same conclusion adopting the reasonable doubt standard. *Snellgrove* v. *State*, 569 N.E.2d 337 (Ind. 1991); *Bradley* v. *Commonwealth*, 439 S.W.2d 61 (Ky. 1969), cert. denied, 397 U.S. 974, 90 S. Ct. 1091, 25 L. Ed. 2d 268 (1970); *Jones* v. *State*, 461 So. 2d 686 (Miss. 1984); *State* v. *Drayton*, 287 S.C. 226, 337 S.E.2d 216 (1985), overruled in part on other grounds, *State* v. *Torrence*, 305 S.C. 45, 70, 406 S.E.2d 315 (1991); *State* v. *Janis*, 356 N.W.2d 916 (S.D. 1984); *State* v. *Owens*, 148 Wis. 2d 922, 436 N.W.2d 869 (1989). We should join these jurisdictions.

In light of "the traditional belief that an accused may be convicted only if exacting measures have been taken to assure that the accused has been treated with the most scrupulous fairness by law enforcement officials"; (internal quotation marks omitted) *State* v. *Stoddard*, supra, 206 Conn. 166; a judgment of conviction based in any part on a coerced confession must be set aside and the case remanded for a new trial. Id., 176–77.

I find the thought that a man or woman may be convicted on the basis of a physically or psychologically coerced confession to be revolting. Requiring a reasonable doubt standard would not only elevate to its proper position the constitutional right not to be compelled to give evidence against oneself, it would also be consistent with the constitutional requirement of proof beyond a reasonable doubt in order to find guilt.[6]

Accordingly, I dissent.

---

[6] Although the trial court at the pretrial suppression hearing applied the heightened reasonable doubt standard, it failed to instruct the jury as to that standard. Of course, the issue of whether the confession is voluntary is one ultimately for the jury.