[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: MOTION TO SUPPRESS
The facts and circumstances surrounding the implication of the defendant in the killing of the victim and his subsequent statements and production of physical evidence are not really in dispute.
Sometime in the late evening hours of December 23, 1996 or the early morning hours of December 24, 1996, the victim was slain by means of a blunt force trauma. Her body was discovered in the company of her two-year old daughter.
Investigation by the Waterbury Police Department led them to learn that the defendant was the last person to see the victim alive. Naturally the police wanted to speak to the defendant. They went to his mother-in-law's apartment at 240 Wood St. in Waterbury. They knocked at the door and were allowed entrance by a woman. The police told the woman that they were looking for the defendant to speak to him. The woman shouted upstairs for the defendant telling him that there were some men here to speak with him. The defendant came downstairs to meet the plain-clothes detectives. The detectives did not display any weapons or utilize any display of force.
The defendant was asked if he knew about an incident that occurred one street over and a few blocks away. The defendant said that he heard that "Gert was killed." (Gertrude Teasely was the victim.) The defendant was asked if he would accompany the detectives to the police station to be interviewed about this matter. He agreed and left with the detectives. He was not handcuffed and the unmarked detective vehicle had doors that could be opened by an occupant. The time was about 4:30 p. m.
At the station the defendant was advised of his constitutional rights in an extremely thorough manner. He read them aloud and signed a so-called rights card. After several hours of intermittent discussions with primarily one detective, the defendant said he wanted CT Page 3925 to get this off his chest or words to that effect. Thereafter there was an oral discussion of his involvement in this incident. Eventually the defendant's statement was reduced to writing on a word processor and the defendant agreed with each sentence and paragraph as it appeared on the computer screen. His statement was printed out. He was again asked to read it, which he did. He also initialed the advisement of rights language that preceded the body of the statement which was read by the defendant and he initialed the appropriate box for each right and also initialed the end of the statement. He then signed the statement after swearing that it was the truth and it was duly notarized.
The defendant was always free to leave the interview room up until the time that he admitted to this crime. The door to the interview room was always open and he had access to food, beverages and a lavatory. The fact that the defendant spent a total of eight hours at the police station, about five of which before he gave his statement orally, was not improper under the circumstances of an ongoing investigation. State v. LaPointe,237 Conn. 694 (1966).
Under all of these circumstances, it is clear to the court that the defendant was not "seized", that he was properly advised of his Miranda rights and that he voluntarily, knowingly and intelligently waived these rights. Accordingly, his statement and subsequently seized physical evidence are not suppressed. See State v. Jones, 237 Conn. 390 (1996).
There is one other issue that the court will address. The defendant has some hearing loss that was documented by the testimony of an audiologist. The defendant suggests that his hearing loss somehow should alter the court's afore stated findings. There is no factual basis to do so. While it is true that the defendant has some hearing loss, it is also quite apparent from the testimony and this court's observation that his impairment has very little impact upon his comprehension and communication skills.
While at the station, the defendant asked to have the officers to face him when speaking, which they did. The police testified that they had perfect communication with him. Further, all of the pertinent matters disclosed by the defendant were displayed on a computer screen as well as a printout. The court's observation of the defendant and his attorney in the courtroom further confirms his communication skills. Any claim that his impairment somehow tainted his interview is totally CT Page 3926 without merit.
GILL, J.